# Firearms Purchase & Permitting in New Jersey

Report to Governor Christopher J. Christie from the New
Jersey Firearm Purchase and Permitting Study Commission
Established Pursuant to Executive Order 180

Commissioners:

Adam J. Heck, Esquire

Eric H. Jaso, Esquire

Erik Lillquist

December 21, 2015

TABLE OF CONTENTS

I.      Introduction ………………………………………………………………..…3

II.     Executive Summary …………………………………………………………3

III.    Process for Obtaining a Gun Permit in New Jersey ………………………………..…5

        A.      Firearms Purchaser Identification Card and Purchase Permit ……………………..…5

        B.      Purchase Permits and Domestic Violence ……………………………………….....9

        C.      Permit to Carry a Handgun ………………………………………………...10

IV.     The "Justifiable Need" Standard for a Carry Permit ……………………………..…..12

        A.      The Development of the Justifiable Need Standard under New Jersey Law …………...13

        B.      The Justifiable Need Standard and the Second Amendment …………………………18

IV.     Domestic Violence Forfeiture Statute ………………...…………………………….... 21

V.      Transporting Firearms ……………………………………………………... 22

VI.     Conclusion ..…………………………………………………………………… 25

# Firearms Purchase & Permitting in New Jersey

## I.    Introduction

On June 3, 2015, Carole Bowne was stabbed to death in her driveway in Berlin, New Jersey by her ex-boyfriend, against whom she had a restraining order.  At the time, Ms. Bowne had a pending application for a permit to purchase a handgun that she had submitted on April 21, six weeks earlier.  She reportedly checked on the status of her permit application just two days before she was murdered.

This tragic incident laid bare some vulnerabilities in New Jersey's stringent firearms laws, including the standard to obtain a firearm permit and an application process that is unevenly applied and often takes more than two months to complete.  On June 29, Governor Chris Christie responded by issuing Executive Order 180, establishing this "New Jersey Firearm Purchase and Permitting Study Commission," which is charged with conducting a review of New Jersey laws, regulations, and procedures pertaining to the ownership and possession of firearms, and making recommendations to the Governor.

Under Executive Order 180, this Commission's mandate is limited. We were charged to conduct "a review of New Jersey laws, regulations, and procedures pertaining to the ownership and possession of firearms" in light of recent events, and in particular, the tragic death of Ms. Bowne.  Executive Order 180 directed that we must ensure the proper balance between an individual's right to self-protection while ensuring the responsible use of firearms and handguns.[1]

Consistent with this limited mandate, the Commission has been reviewing New Jersey's firearms regulatory regime and has identified several issues on which we offer recommendations to improve laws, regulations and procedures that will enable law-abiding New Jersey residents to exercise their Second Amendment right of self-defense, while still maintaining a regulatory structure that enhances public safety by preventing criminals, the psychologically unstable, and other potentially dangerous persons, as well as minors, from purchasing or otherwise obtaining firearms legally.

## II.   Executive Summary

The Commission has focused its attention on impediments to the lawful and responsible exercise of New Jersey citizens' constitutional right to bear arms for self-defense.  Our consideration of the statutes, regulations, case law and procedures concerning the possession of

---

[1] At the same time, the New Jersey Attorney General's Office issued a new regulation, calling for the expedited processing of firearms purchaser identification card and handgun purchase permit applications – within 14 days, if possible – for applicants who are victims of domestic violence and under the protection of a restraining order.

firearms in our state led us to concentrate on three specific issues where bringing further clarity to the application of the law could ease burdens on lawful gun ownership without undermining public safety. Our report and recommendations thus focus on three specific issues: (1) permitting; (2) the "justifiable need" standard for the issuance of carry permits; and (3) transporting firearms within New Jersey.

With respect to permitting, we considered reports that the statutory requirements for obtaining firearm purchaser identification cards, handgun purchase permits and handgun carry permits are being applied unevenly across New Jersey townships. Unnecessary delays in processing applications and the imposition of unauthorized requirements in the application process violate the law and introduce arbitrariness to the exercise of a fundamental right. Accordingly, to ensure that the law is applied consistently throughout the state, we recommend that the Attorney General of New Jersey issue a Directive to local police departments and the State Police identifying a uniform set of criteria for the consideration and processing of firearm permit applications, consistent with current state law.

We also recommend increasing transparency of the permitting process through the collection and publication of processing times by municipality and State Police barracks. Finally, because timely consideration of firearm applications is particularly important in domestic violence cases, we recommend that the State Police formally adopt its pending regulation expediting consideration of applications in cases where the victim is under the protection of a restraining order, and also that the Judiciary be urged to expedite its consideration of carry permit applications and appeals in those cases presenting a heightened risk to domestic violence victims.

Next, the Commission carefully considered the requirements for issuance of concealed carry permits in New Jersey. Specifically, we focused on the statutory requirement that an applicant must demonstrate a "justifiable need" to carry a handgun. Our analysis led us to conclude that the current regulation establishing the standard for meeting the statutory requirement can be broadened to align more closely with the Supreme Court of New Jersey cases from which it is derived. Accordingly, we recommend that the applicable regulation be amended so individuals who can demonstrate an urgent necessity for self-protection by articulating serious threats, specific threats, or previous attacks which demonstrate a special danger to the applicant's life that cannot reasonably be avoided by other means could obtain a carry permit if they otherwise qualify.

We also have considered whether the "justifiable need" requirement remains consistent with the Second Amendment in light of the U.S. Supreme Court's *Heller* and *McDonald* decisions. Notwithstanding several recent cases that have upheld this requirement, we explain why it ultimately may not survive future court scrutiny. In the absence of guidance from the U.S. Supreme Court or the Supreme Court of New Jersey on the contours of the Second Amendment right outside the home, however, we have limited our recommendation to the regulatory change described above.

Finally, this report addresses two scenarios regarding the transporting of firearms within New Jersey that can become traps for the unwary, with serious criminal consequences.

Occasionally, out-of-state residents enter or pass through New Jersey with a firearm that they lawfully possess in their home state, completely unaware that they are breaking New Jersey law. Nevertheless, these visitors are subject to criminal prosecution and a substantial jail sentence for unlawful possession of a firearm. Previous action by the Acting Attorney General encouraging prosecutors to exercise prosecutorial discretion and to consider pretrial intervention in appropriate cases and Governor Christie's judicious use of his pardon power have ameliorated the harsh consequences of these unintentional violations of New Jersey law.

However, in cases of intra-state transport of firearms, where owners are required to go directly from point-to-point (i.e., work-to home or home-to-the-range) subject only to deviations that are "reasonably necessary," there is no guidance from the statute, regulations or case law to guide gun owners, law enforcement or prosecutors as to what constitutes a "reasonably necessary" deviation. The absence of such criteria is a source of much confusion (and fear) for firearm owners that they might unintentionally violate the law by, for example, stopping for gas while transporting their firearm from place to place. Moreover, without defined standards, there is also a risk of inconsistent prosecutions for unlawful possession from county to county. Accordingly, we recommend that the Attorney General issue a Directive providing guidance, including specific examples, for what constitutes a "reasonably necessary" deviation while transporting a firearm.

## III.   Process for Obtaining a Gun Permit in New Jersey

### A.   Firearms Purchaser Identification Card and Purchase Permit

New Jersey law places significant restraints upon who can purchase a firearm in this state, and how and when such purchases can be made. As an initial matter, no person can purchase a rifle or shotgun without first obtaining a firearms purchaser identification card ("FID card").[2] The process for obtaining the FID card begins with the submission of an application for an FID card to the local police chief. Applicants must be fingerprinted, give consent to obtain their mental health records, and provide two references. An applicant must prove that she is a person of "good character and good repute in the community in which [she] lives," and she must not be subject to any of the disabilities set forth in the law, which include: age (under 18), prior criminal conviction, drug addiction, alcohol addiction, mental disease, or being subject to a domestic violence restraining order.[3] An FID card is valid indefinitely unless the holder becomes subject to any of the disqualifying conditions or changes her address. The holder may purchase multiple rifles or shotguns using that FID card.

The purchase of a handgun requires all of the above but is more restricted under the laws of our state. Someone wishing to purchase a handgun must submit an application for a handgun purchase permit.[4] The holder of a handgun purchase permit may purchase only one handgun

---

[2] *N.J.S.A.* 2C:58-3b.
[3] *N.J.S.A.* 2C:58-3c.
[4] *N.J.S.A.* 2C:58-3a.

every thirty days, and a separate permit is required for each handgun.[5]  Long-guns (rifles and shotguns) are not subject to the "one gun per month" law and require only the possession of a valid FID card.

Both FID cards and purchase permits "shall" be issued by the police chief to qualified applicants within thirty days.[6]  Any applicant denied an FID card or a purchase permit is entitled to review by the Superior Court of New Jersey, and a hearing on that application shall take place within thirty days of receipt of the request for review.[7]  Regardless of how quickly the handgun purchase permit application is approved, no one may purchase a handgun unless at least seven days have passed since the applicant submitted her permit application (of course, as we note below, processing the application may take up to thirty days, and sometimes longer).[8]

Accordingly, assuming the application process advances in the course established by the statute, a person seeking to obtain a firearm must wait up to thirty days to receive an FID card and/or purchase permit.  This thirty-day time limit is not permissive; the statute states that the licensing authority, "unless good cause for the denial [of the permit] appears, shall grant the permit or the identification card, or both, . . . within thirty days from the date of receipt of the application . . . ."[9]  In reality, though, it appears that in many jurisdictions in this state, the review process is often delayed well beyond what is permitted under the law.  The Commission has been provided with scores of contemporaneous complaints from permit applicants submitted to the Association of New Jersey Rifle and Pistol Clubs, describing delays, many of them lengthy delays, in the processing of their permits in approximately 100 different jurisdictions.  *See* Appendix A.  Some examples of these reports include:

- An applicant in East Hanover wrote that he applied for an FID card and handgun purchase permit together on May 13, 2013, that he was fingerprinted on May 17, and that his references had returned their documents by the end of May.  On April 9, 2014, this applicant reported that he contacted the Police Department towards the end of February, and they confirmed that they had his paperwork, but as of April 9 – eleven months after he submitted his applications – his applications had still not been addressed.  This was one of several complaints about the processing time in East Hanover.  One applicant claimed that he waited 18 months for two permits to be approved, and another reported on May 10, 2014 that he had been waiting since the end of January (more than three months earlier) for a purchase permit.

- An applicant in Edison reported two different instances where action on his applications took seven months or more.  He wrote that his initial application for an FID card and purchase permit in late 2012 took 7 months to be approved, and that he

---

[5] *N.J.S.A.* 2C:58-3i.  A similar restriction was recently struck down as unconstitutional by the D.C. Circuit in *Heller v. District of Columbia*, 2015 U.S. App. LEXIS 16632 (D.C. Cir. September 18, 2015).

[6] *N.J.S.A.* 2C:58-3d

[7] *N.J.S.A.* 2C:58-3d, f.

[8] *N.J.S.A.* 2C:58-2a(5).

[9] *N.J.S.A.* 2C:58-3f.  The time limit is longer (forty-five days) for nonresident applicants.

applied for two additional handgun permits around Christmas 2014. As of August 10, 2015, he reported that he still had not received his permits.

- A veteran and retired police officer reported that as of April 1, 2014, he had been waiting over six months for the Parsippany Police Department to act on his FID card and handgun permit applications. He wrote that a detective had called him after five months and asked him a few questions about his background but then another month passed without any action being taken on his applications.

- The written application procedures used by the Wanaque Police Department for FID card applicants warns applicants that "it may take up to 6 months to receive your ID Card due to the volume of applications through the NJSP," and also directs applicants not to call the police department to check on the status of their applications.

We are sure that some delays involve "good cause", such as a delay in receiving information from the FBI or SBI, as was the case in *Adler v. Livak*,[10] or the need to follow up on questions that arise during background checks. However, delays of the length noted above and others we reviewed of up to a year in length without any information being provided to the applicants appear to us to be simply unnecessary for the full and proper vetting of gun permit applications, particularly given modern technology and the relative ease of accessing pertinent information about an applicant. Criminal background checks, including fingerprinting, are often completed within a week. As Governor Christie recognized in Executive Order 180, "[n]eedless and unreasonable delay in processing permit applications hinder the lawful and responsible exercise of a constitutional right and the ability of individuals to bear firearms for protection and self-defense."[11] To increase transparency in the permitting process, we will suggest that the Superintendent of the State Police collect and publish annual statistics from municipalities and the State Police concerning the length of time they are taking to process applications for FID cards and firearm permits.

Not only does it appear that some local jurisdictions have not been following the statute's clear commands as to the time for review of FID card and purchase permit applications, but the Commission has also learned that many municipalities across the state do not appear to properly apply the standards for issuance of FID cards and purchase permits, with some imposing additional requirements that, besides being burdensome and unreasonable, violate the law.

New Jersey's firearm permitting statute plainly states: "There shall be no conditions or requirements added to the form or content of the application, or required by the licensing authority for the issuance of a permit or identification card, other than those that are specifically set forth in this chapter."[12] However, we have reviewed complaints that some municipalities have imposed extra requirements such as:

---

[10] 705 A.2d 1218 (N.J. App. Div. 1998) (finding "good cause" to extend the time for consideration of an FID or purchase permit when the delay was from a failure to receive fingerprints from the FBI and SBI).
[11] Exec. Order No. 180 (June 29, 2015).
[12] *N.J.S.A.* 2C:58-3(f).

- Requiring spousal consent
- Demanding a letter of reference from the applicant's employer
- Conducting a "home visit" to the applicant's home
- Requiring proof of employment
- Requiring credit card statement
- Requiring that reference letters be notarized
- Requiring references to not be related to or living with the applicant

Such deviation from the law is exemplified in recent undercover videos released by an advocacy group that appear to show police officers responsible for processing FID card and permit applications in the townships of Orange and Edison misrepresenting the process, discussing unauthorized standards and outright discouraging applicants from seeking an FID card or permit.  Over the course of two videotaped encounters with prospective applicants reportedly occurring on October 15 and November 17, 2015, the Orange police sergeant responsible for processing gun permits made numerous misstatements of the gun permit law and blatantly imposed impediments to obtaining permits.  For example, in October, the officer said it would be "at least three to six months" for the applicant to obtain a handgun permit, and in November, he told the prospective applicant that he would not even be accepting any applications for two months, because the holidays were coming up and he had other year-end business to attend to, as well as a number of vacation days scheduled.  In both encounters, he informed the prospective applicants categorically that they could not obtain a carry permit unless they were employed by a security agency that offers armed security.  The officer told one of the applicants, who said he was employed as a baker and wanted the carry permit for self-defense, that he could not even apply – "the application is not for you. . . .  In New Jersey, no way, no how, it's just not possible."  The officer blamed it on the Legislature.[13]

The Edison Police Department also raised unauthorized roadblocks to a prospective permit applicant, according to an encounter reportedly videotaped surreptitiously on November 16, 2015.  This township apparently requires applicants to provide their work experience and educational background to obtain a carry permit, and when asked, the department representative responded that "That's what the court and the judge wants."  The representative disavowed any role for the Department except "processing" a carry permit application, claiming the Superior Court "are the only ones that have something to do with it."  She also asked this prospective applicant, "What do you want a carry permit for?" to which he replied, "For self-defense."  The representative then said, "For self-defense?  Then you're not gonna get it.  But you can apply. I'm just being honest with you – you are not probably [*sic*] gonna get it."

---

[13] The sergeant also said that elderly people "wouldn't be approved . . . for a handgun," and indicated that he did not approve a woman who was small in size for that reason alone.  The sergeant further pressed one of the prospective applicants on why he wanted a firearm and "why now?" and indicated that he would not approve the applicant because he said he had suffered a spinal cord injury in the past, apparently intending to discourage him from even applying.  Finally, this officer said that he had recommended against one applicant because he had been treated by a psychiatrist, noting that there is a "fine line between confined to a mental institution [disqualifying] and seeing a psychiatrist for a significant amount of time [not disqualifying]."

Such ultra vires requirements and the misrepresentation of New Jersey's Firearms Permit Law depicted on the videos introduce arbitrariness to the approval process, impose unreasonable burdens, increase the time it takes for an applicant to submit a complete application, and create the possibility for discrimination in the approval process.  That such additional requirements violate the law is without question, as the New Jersey courts have found.  Recently, in *In re Perez*, the Appellate Division stated

> The statute plainly precludes the . . . Police Department from imposing burdens on an applicant not required by statute and, therefore, from denying an applicant a purchaser identification card or a permit to purchase a handgun based on the applicant's failure to complete special forms adding to the burden that it has devised.  The Department must use applications in the form prescribed by the superintendent as required by *N.J.S.A.* 2C:58-3e.  Moreover, the Department may not deny applications based on any condition or requirement not specifically set forth in Chapter 58 of Title 2C.  *N.J.S.A.* 2C:58-3f precludes that.[14]

Accordingly, the court reversed the denial of Mr. Perez's FID card and purchase permit applications by the Paterson Police Department, which had created its own form and imposed the following requirements not authorized by the Firearms Permit Law:  a color passport photo; a notarized statement from the applicant attesting to the absence of specified disqualifying conditions; and proof of residence shown by an electric bill, landline phone bill or W-2 form.[15]

## B.  Purchase Permits and Domestic Violence

The need for self-protection may be greatest in cases of domestic violence, as the tragic death of Carol Bowne demonstrates.  To be granted a final restraining order under the Prevention of Domestic Violence Act, a victim must prove an act of domestic violence enumerated in the statute has been committed against her by the abuser, and that a restraining order is necessary to protect the victim from an immediate danger or to prevent further abuse.[16]

Notwithstanding the finding of a violent act against the victim of domestic violence and the court's finding of the potential for future abuse, such a victim must still wait at least seven days after applying for an FID card before purchasing a handgun, even if she intends to keep it only in her home.[17]  As noted, the processing of the purchase permits may (permissibly) take up to a month and in many local jurisdictions may take even longer than that.  This puts such victims seeking to protect themselves at greater risk, as illustrated by Ms. Bowne's case.

To address this issue in the short term, the Attorney General introduced new regulations to expedite the processing of firearms applications for domestic violence victims.  Additionally, while expedited processing may be required to ensure that domestic violence victims who may

---

[14] No. A-0498-12T2 (N.J. App. Div. January 8, 2014), at 6.
[15] *Id.*
[16] *See N.J.S.A.* 2C:25-19a); *Silver v. Silver*, 387 N.J. Super. 112, 125-27 (App. Div. 2006).
[17] N.J.S.A. 2C:58-2a(5)(a).

be particularly vulnerable to the violent acts of others receive their permits quickly enough to protect themselves against those threats, all of New Jersey's law-abiding and eligible citizens who apply for FID cards and purchase permits should receive them in a reasonable amount of time and without undue burdens, impermissible additional requirements or unnecessary delay.

### C.      Permit to Carry a Handgun

Legal ownership of a handgun in New Jersey does not mean that a person can carry that handgun in public. To be allowed to carry a handgun, either openly or concealed, a person must obtain a separate carry permit.[18]  An applicant may apply for an FID card, a permit to purchase a handgun and a carry permit all in the same day, although each application likely will be processed on a different schedule, with the permit to carry taking the longest.  Once an application for a carry permit is submitted to the local police chief or superintendent of the State Police, law enforcement will have 60 days to approve or deny the application, unless the applicant agrees to an extension.[19]  Because only a Superior Court judge may issue a permit to carry a handgun, after the initial law enforcement approval, the application then must be filed with the Superior Court, extending the process beyond two months.[20]

The law reflects a presumption *against* issuing a carry permit, making approvals the exception, not the rule, in New Jersey.  Specifically, the law states that "No application should be approved . . . unless the applicant demonstrates that [she] is not subject to any of the disabilities set forth in 2C:58-3c, that [she] is thoroughly familiar with the safe handling and use of handguns and that [she] has a *justifiable need* to carry a handgun."[21]  Very few applications are granted, and many people are likely discouraged from seeking to obtain a permit because the standard is so high.

The procedures governing the issuance of a carry permit must be consistent with the case law that has evolved defining a "justifiable need" to carry a handgun.  We will discuss the standard at length below, but since a permit to carry requires the "urgent necessity for self-protection,"[22] police departments should expedite, and at a minimum not delay, decisions on a carry permit application.  After all, anyone who does meet the justifiable need standard by definition has an urgent and well-founded need to carry a handgun.  Delay in processing the applications of a person with a justifiable need places her at unnecessary and unjustifiable risk of death or serious injury.  Furthermore, undue delay by police departments can, by itself, mislead the Superior Court to wrongly conclude that there is in fact no urgent necessity for the carry permit.  This problem can be addressed through adoption of the pending regulations and through uniform procedural rules established and enforced by the Attorney General that will ensure the streamlined investigation and resolution of carry permit applications.  An Attorney General

---

[18] New Jersey does not distinguish between concealed carry and open carry of handguns, so all applicants who intend to carry their handguns in public, whether openly or concealed, must submit the application.
[19] *N.J.S.A.* 2C:58-4c.
[20] *N.J.S.A.* 2C:58-4d.
[21] *N.J.S.A.* 2C:58-4c (emphasis added).
[22] N.J.A.C. 13:54-2.4(d).

Directive should also establish criteria to enable law enforcement to determine which situations warrant expedited consideration of a firearm application.

After the police department approves an application for a permit to carry a handgun, the applicant must present it to the Superior Court, which as noted must ultimately approve or deny the permit. Thus, the courts also bear an important responsibility to review applications promptly. In appropriate cases, the Judiciary should order emergent proceedings for the consideration of a person's application to carry a handgun.

**Recommendations**

In light of the foregoing, we recommend:

(1)     that the State Police adopt its regulation directing licensing authorities to expedite applications for FID cards, purchase permits and carry permits for applicants who identify specific threats of serious bodily injury that demonstrate a special danger to the applicant's life and have a substantial likelihood to recur, or who had been the victim of a domestic violence incident resulting in serious injury;

(2)     that the Attorney General prepare and issue a Directive requiring all police departments to follow uniform procedures explained in that Directive. These procedures would adopt best practices and control each aspect of the process to ensure streamlined, consistent application of the governing statutes and regulations, and should require jurisdictions processing firearm applications to inform applicants about the cause of any delays beyond the relevant statutory time limit;

(3)     that the Administrative Office of the Courts be urged to expedite Superior Court hearings on applications in appropriate domestic violence and other cases requiring a determination of justifiable need, regardless of whether the local licensing authority recommended a denial or approval of the application; and

(4)     that the Superintendent of the State Police collect and publish annual statistics from municipalities and the State Police concerning the length of time they are taking to process applications for FID cards and firearm permits.

## IV.   The "Justifiable Need" Standard for a Carry Permit

*"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."*[23]

The right to keep and bear arms articulated in the Second Amendment was recently reaffirmed by the Supreme Court in *Heller v. District of Columbia*[24] and *McDonald v. City of Chicago*.[25]  In *Heller*, the Court concluded the Second Amendment "confer[s] an individual right to keep and bear arms,"[26] while *McDonald* applied that right to the states through the Fourteenth Amendment.

The Supreme Court has not explored the contours of the Second Amendment's protections for possessing firearms outside the home, but has clearly signaled that some protection exists, concluding in *Heller* that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation."[27]  In the absence of Supreme Court guidance, there is a split among the federal courts as to whether and to what extent *Heller* and *McDonald* apply in this context.[28]

The regulatory structure governing the possession of firearms in New Jersey has been in place essentially unchanged for nearly a century.  While there have been cases subsequent to *Heller* and *McDonald* that have considered the applicability of those cases to New Jersey law, it is open to challenge whether New Jersey's procedures and standards governing the possession of firearms, and particularly handguns, are consistent with the Supreme Court's recognition of an individual right to gun ownership for self-protection.

As noted, New Jersey law reflects a presumption that the acquisition and possession of firearms is unlawful.  Notwithstanding this general presumption, New Jersey law contains a broad exemption permitting a person to possess a gun at her home or business, and to transport the handgun between the two (or to and from a firing range) without a carry permit.  As a practical matter, therefore, the statutory presumption against lawful gun ownership is most pronounced in the context of handgun carry permits.  The law states that "any person who

---

[23] U.S. Const. amend. II, § 1.
[24] 554 U.S. 570, 128 S.Ct. 2783 (2008).
[25] 561 U.S. 742, 130 S.Ct. 3020 (2010).
[26] 554 U.S. at 595.
[27] *Id.* at 592 (emphasis added). *See also, id.* at 628 (". . . the need for defense of self, family, and property is *most acute*" in the home) (emphasis added); *McDonald*, 561 U.S. at 780 (". . . our central holding in *Heller*: that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, *most notably* for self-defense within the home.") (emphasis added).
[28] Compare *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013); *Kachalsky v. Cnty. Of Westchester*, 701 F.3d 426 (2d Cir. 2012); and *Woolard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013), *cert. denied*, -- U.S. --, 134 S.Ct. 422 (2013); with *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), *reh'g en banc denied*, 708 F.3d 901 (7th Cir. 2013); *Peruta v. San Diego County*, 771 F.3d 570 (9th Cir. 2014), *vacated and reh'g en banc granted*, 781 F.3d 1106 (9th Cir. 2015); *Wrenn v. District of Columbia*, No. 1:15-CV-162, 2015 U.S. Dist. LEXIS 71383 (D.D.C. May 18, 2015), *vacated*, No. 15-7057 (D.C. Cir. Dec. 15, 2015).

knowingly has in his possession any handgun . . . without first having obtained a permit to carry the same . . . is guilty of a crime of the second degree."[29]

### A.     The Development of the Justifiable Need Standard under New Jersey Law

The New Jersey Handgun Permit Law establishes a process for permits to "carry" handguns, but this process reflects a strong presumption against issuing a permit, stating:

> No application shall be approved . . . unless the applicant demonstrates that he is not subject to any of the disabilities set forth in 2C:58-3c, that he is thoroughly familiar with the safe handling and use of handguns, and that he has a *justifiable need* to carry a handgun.[30]

"Justifiable need" is not defined in the statute or legislative history.  Rather, the standard was developed by the Supreme Court of New Jersey in the 1971 case of *Siccardi v. State.*[31]  In *Siccardi*, the court upheld the denial of a handgun permit to the manager of a Plainfield theater who was required to carry large sums of cash to a bank depository late at night, in an area that had experienced recent incidents of street crime.  The Plainfield police chief concluded that there was an insufficient showing of need, because Siccardi lived close to the theater and his house had never been broken into, he had never been assaulted in twenty years of managing the theater and walking to and from the bank and his house, and the Plainfield Police Department provided police escorts upon request.  The court upheld the decision, affirmed by the Superior Court, to deny Mr. Siccardi a carry permit.[32]

*Siccardi*, it should be noted, was decided on its particular facts.  The court did not articulate a firm standard for an applicant to demonstrate "need" (as the statute was worded at the time) for a carry permit, noting "'[n]eed' is a flexible term which must be read and applied in the light of the particular circumstances and the times."[33]

The court did, however, write approvingly of a policy established by Assignment Judges within the Superior Court that confined carry permits

> to persons specifically employed in security work and to such other limited personnel who can establish an urgent necessity for self-protection. One whose life is in real danger, as evidenced by serious threats or earlier attacks, may perhaps qualify within the latter category but one whose concern is with the safety of his property, protectable by other means, clearly may not so qualify.[34]

---

[29] *N.J.S.A.* 2C:39-5b(1).  A second-degree crime carries a penalty of 5-10 years in prison. *N.J.S.A.* 2C:43-6a(2).
[30] *N.J.S.A.* 2C: 58-4c (emphasis added).
[31] 284 A.2d 533 (N.J. 1971).
[32] *Id.* at 540.
[33] *Id.* at 539.
[34] *Id.* at 540.

In upholding the denial of Mr. Siccardi's application, the court wrote, "So far as the suggested threats to his life are concerned, we accept the view of the local Chief of Police that they were not serious in nature and did not call for police action."[35]

*Siccardi* was followed 19 years later by *In re Preis*,[36] which considered whether employees of a private security agency could obtain carry permits in connection with their work providing security to a tugboat company that was engaged in a labor dispute. The Supreme Court of New Jersey decided that the employees had not made a showing that they were entitled to the permits.

The court began by pointing out that *Siccardi* had interpreted the statutory standard to require the private security employee to demonstrate "an urgent necessity for protection of self or others – as, for example, in the case of one whose life is in danger as evidenced by *serious threats or earlier attacks*."[37] After reviewing the facts, and noting that the trial court had found that "there was 'no evidence of any great need of armed guards'"[38] in this matter, the court turned to the legal issues in the case, which it framed this way:

> The question in this case is whether the policy stated in *Siccardi* in favor of issuing permits to persons employed in security work justifies the generalized issuance of a permit *without demonstrable need to carry guns for self-protection from dangers either to self or to others.*[39]

In other words, the *Preis* court was clear that there had been no showing of any particularized need for a handgun in the case, and that the real issue was whether involvement in security alone would justify the issuance of a carry permit.

Applying *Siccardi*, the court answered the question no, emphasizing that "[g]eneralized fears for personal safety are inadequate, and a need to protect property alone does not suffice."[40] However, while expressly citing what it described as the "*Siccardi* rule," the court articulated it thusly: "[t]he requirement is of *specific* threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other means."[41] The *Siccardi* court never required "specific threats"; instead that decision described the standard as "an urgent need for

---

[35] *Id.*

[36] 573 A.2d 148 (N.J. 1990). Between *Siccardi* and *Preis*, the statutory standard for issuance of a handgun permit had been altered slightly to require "justifiable need" instead of "need" as part of the general revision of the criminal law of New Jersey in 1978. We have not found any legislative history suggesting that the insertion of "justifiable" was meant to change the standard for issuance of a handgun carry permit, and the *Preis* court decided the case assuming that the change in language made no practical change in the standard. Indeed, the *Preis* court was explicit in stating that "the most relevant definition of 'justifiable need' was set forth in *Siccardi*," even though that case was decided under the earlier statutory language. 573 A.2d at 151; *see also Drake v. Filko*, 724 F.2d 426, 48 (3d Cir. 2013) (Hardiman, J., dissenting) (noting that the "New Jersey courts have not ascribed any significance to [the] change in phrasing").

[37] *Id.* at 149 (emphasis added).

[38] *Id.* at 150.

[39] *Id.* at 152 (emphasis added).

[40] *Id.* at 152 (citing *Siccardi*).

[41] *Id.* at 152 (emphasis added).

self-protection" for someone whose life is in "real danger" as evidenced by "*serious* threats or earlier attacks", and affirmed the denial of the permit because the nature of the threats alleged by the applicant were not "serious in nature."[42]  The *Preis* court did not explain its use of the term "specific threat," or signal an intent to change the standard.[43]

In the absence of any stated intention to change the standard in *Preis*, we are left with the problem of understanding what the *Preis* court meant by its slightly modified articulation of the "*Siccardi* rule".  In our view, the court was articulating how the standard of a serious threat could be met: by, for example, evidence of specific threats or of previous attacks. But the ultimate standard for "justifiable need" remains the same: a demonstration that there is an urgent necessity for protection of self or others.[44]

Although the *Preis* court did not suggest that the standard for satisfying "justifiable need" had been changed in any way, the New Jersey Administrative Code states that "justifiable need" for a handgun carry permit means

> [T]he urgent necessity for self-protection, as evidenced by *specific* threats
> or previous attacks which demonstrate a special danger to the applicant's
> life that cannot be avoided by means other than by issuance of a permit to
> carry a handgun.[45]

The standard of "justifiable need" reflected in the Administrative Code has become embedded in New Jersey jurisprudence concerning applications for handgun carry permits.  But in the absence of a clear signal from the New Jersey Supreme Court in *Preis* that it intended to change the standard articulated in *Siccardi,* the regulation establishes a standard that is more restrictive than the governing precedents of our state's Supreme Court.

The Commission also recommends that the standard ought to be amended to make explicit what we believe has always been implicit: that the requirement be that the permit should issue where the dangers to the applicant's life cannot *reasonably* be avoided other than by issuance of the permit.  Without this change, the regulation appears to suggest that if there is anything the applicant could do to avoid the danger—including move to another state or even another country—the permit should not issue.  But it defies our imagination to believe that this is what the Legislature intended by requiring "justifiable need."  Instead, as in so many other areas

---

[42] 284 A.2d at 540 (emphasis added).

[43] The *Pries* court did cite two other cases, *Reilly v. State*, 284 A.2d 541 (N.J. 1971), and *In re Application of X*, 284 A.2d 530 (N.J. 1971). Both of these cases were companion cases that had been argued to the Supreme Court with *Siccardi* that merely apply the *Siccardi* decision to their facts, and neither case mentions the word "specific."

[44] We note that there are two possible constructions to the "urgent necessity" requirement – one procedural and once substantive. Specifically, "urgent necessity" could refer either to the need to have a permit issued immediately (because the threat to the applicant potentially is imminent) or to the applicant's need to act "urgently" when the potentially life-threatening threat emerges at an unknown time.  Under the second interpretation, a stalking victim need not show that she will be attacked imminently; it should suffice to meet the urgent necessity standard for the applicant to demonstrate a serious or specific threat of a life-threatening attack in the near future.

[45] N.J.A.C. 13:54-2.4(d) (emphasis added).

of the law, what we believe the Legislature and our Supreme Court intended was for the applicant to show that she could not take other *reasonable* steps to avoid the danger.

Based on the foregoing, the Commission believes that the standard of justifiable need as reflected in the regulation and routinely applied by police chiefs and courts considering carry permit applications should be modified in a manner that is both consistent with the statutory requirement of justifiable need and with the standard as articulated and applied by our Supreme Court. We therefore recommend revising the regulation to require an applicant to demonstrate:

> [T]he urgent necessity for self-protection, as evidenced by *serious threats, specific threats, or previous attacks* which demonstrate a special danger to the applicant's life that cannot *reasonably* be avoided by means other than by issuance of a permit to carry a handgun.

These changes, we believe, harmonize the decisions in *Siccardi* and *Preis*. While some may believe that these are merely cosmetic changes, we view them as important ones, as demonstrated by the recent case of *In re Racanelli*.[46]  Joseph Racanelli is an emergency room doctor with offices in New York and New Jersey who was mugged by a gunman and had his car stolen on a Newark street on May 8, 2013. Three weeks later, he submitted an application for a carry permit to his local police chief, and informed the chief that he had an office in Newark and also referred to the recent robbery. The police chief denied his application on two grounds -- that he had not demonstrated that he was thoroughly familiar with the safe handling and use of firearms, and because he had not demonstrated a justifiable need. Much of the opinion of the Superior Court upholding the police chief's decision centered on the safe handling issue. However, the court's discussion of justifiable need underscores that the standard, as currently set forth in the regulation, is misleading.

Although the regulation states that the "urgent need for self-protection" can be demonstrated by evidence of previous attacks, the court discounted the attack on this physician three weeks before he applied for his permit in 2013 because, at the time of the decision in June 2015, two years had passed without him having been assaulted again. Thus, the court credited the prosecutor's argument that Dr. Racanelli showed only "an unsubstantiated generalized fear, insufficient to justify the permit."[47]

Clarifying the regulation in the way we propose could allow persons like Dr. Racanelli to obtain a carry permit, assuming, of course, they meet the other statutory conditions, i.e., that they are not subject to a statutory disability and that they are familiar with the safe handling and use of firearms. Recall that, at the time of his application, Dr. Racanelli had a need to travel at odd hours, into a high crime area in which -- at the time of his application -- he had recently been robbed. While he may not have faced a *specific* threat of danger to his person, he surely had an

---

[46] No. A-3584-13T2, 2015 N.J. Super. Ct. App. Div. Unpub. LEXIS 1518, at *7 (June 23, 2015), *cert. denied*, 122 A.3d 991 (N.J. 2015).
[47] *Id.* at 14. Of course, courts rarely have the benefit of hindsight from a process that in Dr. Racanelli's case lasted two years to be resolved, and in our view, the threat to the applicant should be evaluated as of the time the application is submitted.

urgent need for self-protection, which after all is the ultimate standard, both because he faced a *serious* threat of danger and because he had been mugged.

The recommended change to the regulation also potentially would allow for the approval of a carry permit in the following scenarios where there would be a serious threat of death or serious bodily harm, but not a specific threat, to the applicant:

(1) A hate group with a history of inspiring racially/religiously-motivated violent attacks posts a picture of a particular house of worship on its website. The posting states, "We know who you are. We've followed you home. We've followed you to work. We've followed you when you take your kids to school. And we're going to kill you." A week later, five cars had their tires slashed in the parking lot of the house of worship, and the hate group's initials were scratched onto each car's hood. Pictures of the cars were posted on the group's website with the caption, "This time we came for your cars. Next time we're coming for you. None of you is safe from us." The carry permit applicant is a member of this house of worship.

(2) The handgun carry permit applicant is one of several eyewitnesses to a murder committed in broad daylight on a public street. The murder suspect, who has been arrested and charged for the crime, is reported to be a high-ranking member of a violent street gang. This particular gang has a reputation for witness intimidation. Law enforcement authorities have reported that within the past two years, at least two other people had been shot, one fatally, as part of the gang's modus operandi to obstruct justice by eliminating witnesses. In fact, the very murder that the applicant witnessed was described in court by an assistant prosecutor to have been committed in retaliation for cooperation that the victim had provided to law enforcement.

(3) The handgun carry permit applicant is a taxi driver who often works the night shift in a particular precinct. In recent months, one or more armed assailants have flagged down cabs in this area after dark and robbed the drivers at gunpoint. These robberies have occurred on at least six occasions in the past four months. Two drivers were shot in these brutal attacks; one was killed and the other seriously wounded. The surviving victim reported that he was shot even though he had complied with the assailant's demand to turn over cash.

### B.   The Justifiable Need Standard and the Second Amendment

Clearly the standard of "justifiable need," in existence for nearly a century,[48] places a substantial burden on the applicant for a handgun carry permit, and recent cases have maintained this high bar.[49] Several state and federal cases decided since *Heller* and *McDonald* have addressed the constitutionality of this regulatory structure, and to date, all have upheld it.[50]  We believe, however, that there is a significant possibility that some provisions of existing New Jersey law will eventually be struck down, and in particular the "justifiable need" standard.

The two primary cases addressing the constitutionality of the justifiable need standard post-*Heller* and *McDonald* are *Drake v. Filko* (a 2-1 decision by the Third Circuit),[51] and *In re Wheeler*, by the New Jersey Appellate Division.[52]  The courts in both *Drake* and *Wheeler* began their analyses by questioning whether the Second Amendment right even applies outside the home, although both ultimately concede for argument's sake that the right does extend into public places.[53]

In *Drake*, the court next turned to a related question: if the Second Amendment does apply outside the home, is there a right to carry a handgun outside the home?  As articulated by the court, the question was "whether or not the requirement that applicants demonstrate a 'justifiable need' to publicly carry a handgun for self-defense burdens conduct within the scope of that Second Amendment guarantee."[54]  The court noted that the Supreme Court in *Heller* had identified some "longstanding prohibitions on the possession of firearms" to be presumptively lawful.[55]  Although neither the justifiable need standard nor its equivalent in a few other states was included in the list of *Heller*, the Third Circuit nonetheless found that it was such a longstanding prohibition and therefore "regulated conduct falling outside the scope of the Second Amendment's guarantee."[56]

---

[48] *See Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013).

[49] *See, e.g., In re Pantano*, 60 A.3d 507 (N.J. App. Div. 2013) (upholding conclusion that the applicant, a landscaper, had not demonstrated a justifiable need to carry a handgun despite his concerns that strangers often knew he carried large sums of cash and his father had been a victim of an armed robbery while running a similar business; applicant had not identified any specific, imminent threats to himself, and had the option of retaining private security guard); *Racanelli* (upholding denial of handgun permit to emergency room physician who worked odd hours in Newark, and who had been robbed of his car by gunmen three weeks before submitting his application, and noting that "no one with a firearm had confronted him" since that 2013 robbery); *Drake* (upholding denials by New Jersey courts of handgun permits to, among others, (1) an FBI employee who received information about a specific threat against him; (2) an applicant who operates a business that restocks ATM machines with cash; (3) a Reserve Sheriff's Deputy who sought a gun for protection when he was off-duty; and (4) an individual who sought to carry a handgun after being attacked and kidnapped by a criminal gang).

[50] *See, Drake*, 724 F.3d 426 (3d Cir. 2013); *In re Wheeler*, 81 A.3d 728 (N.J. App. Div. 2013); *Pantano*, 60 A.3d 507 (N.J. App. Div. 2013), *appeal dismissed as improvidently granted*, 2014 N.J. LEXIS 904 (May 22, 2014).

[51] 724 F.2d 426 (3d Cir. 2013).

[52] 81 A.3d 728 (N.J. App. Div. 2013). The Appellate Division also addressed the constitutionality of the justifiable need standard in *Pantano*, but with a much more limited discussion and analysis than in *Wheeler*, so we only address *Wheeler* in our report.

[53] *See Drake*, 724 F.3d at 430-31; *Wheeler*, 81 A.3d at 747-49.

[54] *Drake*, 724 F.3d at 431.

[55] *Id.* at 432 (citing *Heller*, 554 U.S. at 574).

[56] *Id.* at 434.

While the *Wheeler* court also discussed whether the "justifiable need" standard was a presumptively lawful regulation, its decision did not ultimately turn on this analysis.[57]  Instead, the *Wheeler* court assumed that there was an existing right to carry a handgun in public places for defensive purposes, and then asked whether the justifiable need standard improperly burdens that right.[58]  In addressing this question, the Appellate Division relied in part upon the majority opinion in *Drake*, which had addressed this same issue, albeit as an alternative holding to its central decision that there was not a Second Amendment right in these circumstances.

The key issue in deciding whether the justifiable need standard impermissibly burdens the Second Amendment right is the proper level of scrutiny to apply to such claims: strict scrutiny or intermediate scrutiny.[59]  Both the *Wheeler* and *Drake* courts concluded that the correct standard to apply was intermediate scrutiny, which requires that the government have a significant, substantial or important interest, and that the fit between the legislation and that interest be reasonable, such that the legislation does not burden the exercise of the right more than is reasonably necessary.[60]

Both the *Wheeler* and *Drake* courts found that the justifiable need standard survived such intermediate scrutiny review.  The *Drake* court began by noting that the State of New Jersey has a substantial interest in "protecting its citizens' safety," so the real question was whether there was "a 'reasonable fit' between the interest in safety and" the justifiable need standard;[61] the *Wheeler* court reached a similar conclusion.[62]  The two courts then went on to find that the fit between the justifiable need standard and the interest in protecting the citizens was reasonable.  The *Drake* court acknowledged that there was little evidence to show how the standard fit with the state's need to protect the safety of citizens, but the court overlooked the absence of legislative history to support the "predictive judgment" because "New Jersey's legislators could not have known that they were potentially burdening protected Second Amendment conduct."[63]

The *Wheeler* court took a slightly different approach.  The Appellate Division noted that the justifiable need standard was part of a larger group of exceptions to the general prohibition on the public possession of firearms in this state and that it worked with other requirements, such as that of firearms training, to ensure the public's safety.  In particular, the Appellate Division noted that the justifiable need provision serves the same purpose of ensuring safety as those exceptions for carrying related to particular professions (such as being a law enforcement officer) by allowing "those who can show an objective reason . . . other than a generalized concern about becoming a crime victim to anticipate an attack necessitating the defensive use of a handgun can obtain a carry permit tailored to their showing of need."[64]

---

[57] *See Wheeler*, 81 A.3d at 752.
[58] *Id.*
[59] As the court noted in *Wheeler*, "the [Supreme Court] effectively narrowed the potentially applicable standards . . . by concluding that the rational basis test 'could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right [including] the right to bear arms.'" *Id.* at 753 (quoting *Heller*, 554 U.S. at 628.
[60] *Drake*, 724 F.3d at 436; 81 A.2d at 756.
[61] 724 F.3d at 437.
[62] 81 A.3d at 757.
[63] 724 F.3d at 438.
[64] 81 A.3d at 759.

It is prudent to consider whether the *Wheeler* and *Drake* decisions will stand up as the law on the Second Amendment evolves. We note that in *Siccardi*, the Supreme Court of New Jersey observed that "'[n]eed' is a flexible term which must be read and applied in the light of the particular circumstances and the times."[65] Certainly, the suggestion in *Drake* that the Second Amendment right might be limited to the home seems highly dubious, as the *Wheeler* court itself notes. Furthermore, it seems unlikely to us that the Supreme Court will ultimately conclude that the justifiable need standard is the sort of longstanding regulation of firearms that falls outside of the scope of the Second Amendment. Restrictions of the sort that New Jersey has on both open and concealed carry of handguns are both relatively rare in the United States, and are generally a phenomenon of the twentieth century.

Instead, we believe that the ultimate question will be whether the justifiable need standard can survive intermediate scrutiny. We note that the United States District Court for the District of Columbia, in *Wrenn v. District of Columbia*, recently enjoined enforcement of the District of Columbia's regulation governing the issuance of handgun carry permits that had a "good reason/proper reason" requirement that was strikingly similar to New Jersey's justifiable need regulation.[66] Specifically, the D.C. regulation stated that the police chief "may" issue a license to a person to carry a pistol "if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol and that he or she is a suitable person to be so licensed."[67] This provision further required the District's police chief to issue rules establishing criteria for "good reason," specifically by requiring the applicant to demonstrate

> a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life.[68]

While recognizing that the District has had a longstanding "good reason-type" requirement that was presumptively lawful under *Heller*, the court nevertheless concluded that "the 'longstanding' inquiry is irrelevant" because the "'good reason/proper reason' requirement has more than a 'de minimis' effect on their rights."[69] Further,

---

[65] 284 A.2d at 539.

[66] *See Wrenn v. District of Columbia*, No. 1:15-CV-162, 2015 U.S. Dist. LEXIS 71383 (D.D.C. May 18, 2015), *vacated*, No. 15-7057 (D.C. Cir. December 15, 2015). On December 15, 2015, the Court of Appeals for the District of Columbia vacated the district court's decision on jurisdictional grounds, because of a technical defect in the designation of the District Judge hearing the case: Judge Scullin, who ordinarily sits in the Northern District of New York, had been properly designated to hear a related case in the District Court of the District of Columbia, but that designation was not extended to cover the *Wrenn* case. The D.C. Circuit's decision did not address the merits of the Judge Scullin's opinion.

[67] *Id.* at *4, quoting D.C. Code § 22-4506(a).

[68] *Id.* Notably, the specified criteria also provides for approval when the applicant has "demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person."

[69] *Id.* at *14.

> Plaintiffs, as well as the vast majority of law-abiding citizens, who fail to satisfy the District of Columbia's "good reason/proper reason" requirement because they cannot "show a special need for self-protection distinguishable from the general community" . . . are unable to exercise their fundamental right to bear arms for self-defense under the Second Amendment.[70]

Having thus concluded that this standard impinges upon the plaintiffs' Second Amendment right, the court next considered whether it *unlawfully* burdens that right, applying the intermediate scrutiny test.[71]

The District defended its regulation by asserting its interest in preventing crime and protecting public safety (the same interest advocated by our state), which it argued is advanced by reducing the number of concealed weapons in public. The court credited the District's interest in safety, but found that it "failed to demonstrate that there is any relationship, let alone a tight fit, between reducing the risk to other members of the public and/or violent crime and the District of Columbia's 'good reason/proper reason' requirement."[72] Citing the dissent in *Drake*, which as we have discussed considered New Jersey's almost identical justifiable need standard, the *Wrenn* court explained

> The fact that an individual may be able to demonstrate a greater need for self-protection, and therefore meets the "good reason/proper reason" requirement, does not indicate, in any way, whether that person is less likely to misuse handguns or be less dangerous. . . . The fact that a person may have a greater need for self-protection says nothing about how limiting the carrying of handguns to such individuals would result in a reduction of risk to other members of the public or reduce violent crime. Is the Court to conclude that people who do not have a heightened need for self-protection are more likely to commit violent crimes? . . . Moreover, isn't it possible that even persons who cannot manifest a present need for self-protection are just as likely to be victims of a violent crime[?][73]

As the *Wrenn* case illustrates, there is ample reason to question whether New Jersey's "justifiable need" requirement for approval of a carry permit – as set forth generally in the statute and as amplified in the Administrative Code – comports with the Second Amendment, particularly in light of the split of authority and the absence of guidance from the highest courts in our State or our nation. Nevertheless, the Commission is mindful that, at least for now, the statutory "justifiable need" requirement is the law of the State. Given the uncertainty in the case law, which inevitably will be clarified through further litigation, a legislative proposal would appear to be premature. The Commission thus recommends making the modest, but meaningful adjustment to the Administrative Code provision described above, which falls easily within the

---

[70] *Id.* at *15-16.
[71] *Id.* at *16 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011)).
[72] *Id.* at *23-24.
[73] *Id.* (citing *Drake*, 724 F.3d at 454 (Hardiman, C.J., *dissenting*)).

statutory requirement and aligns directly with the Supreme Court of New Jersey cases from which the regulatory standard is derived.

We conclude by noting that *Wheeler* itself appears to suggest that our proposed regulatory change should make it more likely that the justifiable need standard will survive future constitutional challenges. By emphasizing that an applicant need only "show an objective reason . . . other than a generalized concern about becoming a crime victim to anticipate an attack necessitating the defensive use of a handgun," the *Wheeler* court standard allows for the sort of meaningful self-protection by a law-abiding applicant that we believe will be necessary (at a minimum) for our handgun permitting laws to survive constitutional scrutiny. Maintaining the Administrative Code's present misreading of *Siccardi* and *Preis* that an applicant must demonstrate a "specific threat" in order to obtain a carry permit seems likely to result eventually in a successful constitutional challenge to the justifiable need standard.

**Recommendation**

Based on the foregoing discussion, the Commission recommends that the State Police revise its regulation describing "justifiable need" to require, as noted above:

> [T]he urgent necessity for self-protection, as evidenced by serious threats, specific threats, or previous attacks which demonstrate a special danger to the applicant's life that cannot reasonably be avoided by means other than by issuance of a permit to carry a handgun.[74]

**V.  Transporting Firearms**

Enforcement of New Jersey laws governing the transport of firearms has led to situations where otherwise law-abiding citizens have been charged and convicted of illegal possession of a firearm when that possession unwittingly violates sometimes vague and confusing statutes. Additionally, penalties for these crimes carry harsh mandatory minimum prison sentences normally reserved for the use of a firearm during the commission of other serious crimes. Two sets of circumstances illustrate this issue and the potential for unjust application: (a) possession of a weapon in New Jersey by persons licensed to carry a firearm in another state, and (b) the deviation from direct travel between two locations where a person may legally transport their firearms.

Firearm laws, and particularly carrying laws, can vary dramatically from state to state. Occasionally, out-of-state residents enter or pass through New Jersey with a firearm that they lawfully possess in their home state, completely unaware that they are breaking New Jersey law. Nevertheless, these visitors are subject to criminal prosecution and a substantial jail sentence for unlawful possession of a weapon under <u>N.J.S.A.</u> 2C:39-5. Governor Christie has brought attention to these harsh consequences in public comments and through several pardons in cases

---

[74] *See* N.J.A.C. 13:54-2.4(d).

where the individuals traveled through New Jersey with a firearm lawfully owned in their home state and without any criminal intent.

In 1981, the Legislature passed the Graves Act, requiring the imposition of a minimum term of imprisonment and parole ineligibility for certain gun-related crimes.[75] Persons convicted of a crime governed by the Graves Act are not eligible for pre-trial diversionary programs, except very limited circumstances.[76]

At the time the Graves Act was passed, the minimum term was only applicable in cases where a person was convicted of possession or use of a firearm while in the course of committing certain crimes, or possession of a firearm for an unlawful purpose, in violation of N.J.S.A. 2C:39-4(a). In 2008, however, the Graves Act was expanded to include more gun-related crimes, including simple unlawful possession of a handgun, which was elevated to a second-degree crime.[77] At that time, the Attorney General issued a directive to county prosecutors to ensure uniform enforcement of the Graves Act.[78] The 2008 Directive encouraged a strict enforcement of the presumption of ineligibility for the pretrial intervention program ("PTI") in Graves Act cases. Under the Graves Act, persons convicted of unlawful possession of a firearm generally must serve 42 months in prison before being eligible for parole.

In 2014, New Jersey's Acting Attorney General issued a memo to the Director of the Criminal Division and to county prosecutors clarifying the 2008 Directive, specifically addressing cases involving out-of-state residents arrested for gun possession in New Jersey who were legally carrying their weapon according to the laws of their state.[79] The memo encouraged the use of prosecutorial discretion to consent to PTI in out-of-state gun owner cases where there are no aggravating factors, to mitigate the harsh effect of the Graves Act. The memo sets forth a list of factors to be considered by the prosecutor when determining whether to consent to PTI, including whether the gun-possession offense was isolated, whether there was minimal exposure of the firearm to New Jersey residents, whether the owner volunteered the presence of the firearm, and whether the owner surrendered the unloaded firearm for safe keeping, among other factors. Thus, out-of-state citizens who are charged with unlawful possession and face significant jail time for carrying a firearm that they lawfully possess in their home state can now be offered PTI, subject to the prosecutor's discretion.

Explaining his willingness to grant pardons to the out-of-state travelers facing a gun possession charge in New Jersey, Governor Christie said, "we should have certain respect for folks who have permits in other states." Governor Christie has pardoned several out-of-state individuals who were charged with possession of a firearm in New Jersey but who lawfully

---

[75] N.J.S.A. 2C:43-6c.

[76] N.J.S.A. 2C:39-5h.

[77] See P.L. 2007, c. 342.

[78] Attorney General Directive to Ensure Uniform Enforcement of the "Graves Act" (Oct. 23, 2008), updated by Correction to "Graves Act" Directive Regarding Extended Term Eligibility (Nov. 25, 2008), available at http://www.state.nj.us/lps/dcj/agguide/pdfs/Graves-Act-Oct23-2008.pdf.

[79] Clarification of "Graves Act" 2008 Directive with Respect to Offenses Committed by Out-of-State Visitors From States Where Their Gun-Possession Conduct Would Have Been Lawful (Sept. 24, 2014), available at http://www.nj.gov/oag/dcj/agguide/directives/Graves-Act-clarification-2014.pdf.

possessed their guns in their home state and posed no threat to anyone. The recipients of these pardons included Brian Lee Fletcher, a resident of North Carolina who was arrested while in Hamilton Township where he was performing emergency storm-related utility repairs after he voluntarily told an officer he had a handgun in his vehicle. Similarly, Shaneen Allen, a Pennsylvania woman, was arrested outside Atlantic City after disclosing her firearm to police officers during a traffic stop. Elizabeth Jane Griffith, of Daytona Beach, Florida, and Todd Doering from Lansdale, Pennsylvania, were also pardoned after being charged with unlawful possession of a weapon when carrying their legally-owned guns in New Jersey.

Of course, responsible gun owners should be held accountable for knowing the laws of any state or other jurisdiction into which they are transporting a gun, even when they lawfully own and carry the firearm in their home state. Nevertheless, the law in New Jersey can impose unduly harsh consequences upon firearm owners who transport their otherwise-legal guns into New Jersey inadvertently and with no ill intent, and thus the 2014 Directive and the use of the Governor's pardon power have had a salutary effect in avoiding unjust penalties in such cases.

There is another situation, however, where a lack of clarity in the law can ensnare law-abiding individuals transporting firearms within the state in an unlawful possession charge. N.J.S.A. 2C:39-6 creates a number of exemptions from the definition of unlawful possession of a firearm. One of these exemptions relates to transporting a firearm within New Jersey. The exemption applies to point-to-point travel (e.g., business to home) with the firearm unloaded and properly secured with "only such deviations as are reasonably necessary under the circumstances."[80] The statute, however, does not define what constitutes a "reasonably necessary" deviation, and this creates uncertainty for firearm owners and the risk of arbitrary or inconsistent prosecutions for unlawful possession if, for example, they stop for gas or take-out food, or encounter an emergency on their way from point-to-point.

A bill specifically aimed at clarifying this provision has stalled in the Legislature, but the Commission does not believe that legislation is needed. In the absence of a statutory definition of a "reasonable necessary deviation" or case law that has developed a standard, we believe the Attorney General can bring clarity and consistency to the application of N.J.S.A. 2C:39-6g by providing guidance to police and prosecutors though an Attorney General Directive. This Directive would establish standards for what constitutes a "reasonably necessary deviation" from point-to-point travel while transporting a lawfully-owned firearm and thus create a higher degree of predictability in charging decisions and clarity for firearm owners seeking to comply with the transport provision.

**Recommendation**

The Commission recommends that the Attorney General issue a Directive or similar guidance to state law enforcement officers and prosecutors providing guidance on what constitutes a "reasonably necessary" deviation in point-to-point travel while transporting an unloaded firearm within New Jersey, that would include, but not necessarily be limited to such

---

[80] *N.J.S.A.* 2C:39-6g.

examples as picking up and dropping off passengers, purchasing food, fuel, medicine and other supplies, using a restroom, or contending with an emergency situation.

## VI.    <u>Conclusion</u>

Firearm statutes and regulations must strike a balance between protecting society and respecting the right of law-abiding persons to possess firearms.  New Jersey's laws are among the most restrictive in the country, and the tragic case of Carol Bowne, and other recent injustices apparent in certain firearms prosecutions demand action to ensure both the constitutionality and practicality of this stringent regulatory regime in light of *Heller* and *McDonald.*  The Commission's recommendations reflect actions that could be taken to improve conditions in New Jersey that prevent law-abiding citizens from exercising a fundamental right.  This is especially important when those citizens are or may be the targets of domestic violence and other criminal acts.

# APPENDIX A

**Reported Delays by Municipalities**

| Town/PD | Type of permit applied for | Date of application |
|---|---|---|
| East Hanover | FID, Handgun Purchase Permit | 5/13/2013 |
| East Hanover | Handgun Purchase Permit | |
| East Hanover | Pistol Purchase Permit | 1/31/2014 |
| Hoboken | FID | 11/30/2012 |
| Harrison | Handgun Purchase Permit | 12/8/2014 |
| Harrison | FID, Pistol Purchase Permit | 9/8/2014 |
| Edison | FID, Handgun Permits | 10/29/2014 |
| Edison | Handgun Permit | 9/19/2014 |
| Edison | Handgun Purchase Permit | 5/16/2014 |
| Edison | FID, Handgun Permit | 12/23/2014 |
| Neptune | Firearms Permit | |
| Neptune | FID change of address | 3/22/2013 |
| Garfield | FID, Handgun Permits | 12/9/2013 |
| Garfield | FID, Handgun Permits | 3/27/2014 |
| Wallington | FID, Handgun Purchase Permit | 10/1/2012 |
| Wallington | FID change of address, Pistol Permit | 5/18/2013 |
| Parsippany | Purchase Permit | 11/14/2014 |
| Parsippany | FID, Pistol Permit | |
| Parsippany | Pistol Permits | 12/12/2014 |
| Parsippany | Handgun Permit | 10/28/2014 |
| Parsippany | Handgun Permit | 10/16/2013 |
| Wanaque | Pistol Permit | |
| Elizabeth | Handgun Permit | |
| Elizabeth | Handgun Permit | November 2013 |
| Little Falls | Handgun Purchase Permit | 8/15/2013 |
| Little Falls | FID change of address | 10/15/2013 |
| Woodland Park | Handgun Purchase Permit | 4/9/2014 |
| Woodland Park | Handgun Permit | |
| Woodland Park | Pistol Purchase Permit | 2/1/2014 |
| Bogota | Purchase Permit | 4/11/2014 |
| Bogota | FID, Handgun Purchase Permit | 1/28/2014 |
| Middletown | Pistol Purchase Permits | April 2014 |

**Reported Delays by Municipalities**

| | | |
|---|---|---|
| Middletown | Pistol Permit | 3/7/2014 |
| Middletown | Handgun Permit | October 2014 |
| Lodi | FID, Handgun Purchase Permit | 1/20/2014 |
| Lodi | Purchase Permit | 11/20/2014 |
| Lodi | Pistol Permit | |
| Clifton | Handgun Permit | |
| Clifton | Handgun Purchase Permit | 3/20/2014 |
| Clifton | Name change on FID, permits | November 2013 |
| Sparta | Handgun Permits | October 2013 |
| Sparta | Handgun Permit | 12/30/2013 |
| Sparta | Handgun Purchase Permit | 6/10/2014 |
| Bloomfield | Handgun Permits | 10/23/2014 |
| Bloomfield | Handgun Permits | 1/7/2015 |
| Bloomfield | Handgun Permits | |
| Ringwood | FID, Handgun Permits | 5/22/2014 |
| Ringwood | Handgun Purchase Permit | 6/26/2014 |
| East Brunswick | Permit extension | |
| Glassboro | Handgun Permits | |
| Glassboro | Pistol Permits | 7/28/2014 |
| Glen Rock | Pistol Permit | |
| Allamuchy | FID | February 2013 |
| Andover | Handgun Purchase Permit | 12/4/2013 |
| Atlantic Highlands | Pistol Permit | |
| Basking Ridge | FID, Handgun Purchase Permit | 5/18/2014 |
| Bayonne | Handgun Purchase Permits | 8/20/2014 |
| Bayville | Handgun Permit | |
| Beachwood | Handgun Permit | |
| Bayville | Handgun Permit | |
| Boonton | Handgun Purchase Permit | 1/21/2014 |
| Boonton | FID, Pistol Permit | |
| Brick Township | Handgun Purchase Permits | 1/10/2014 |
| Caldwell | Handgun Purchase Permits | 2/23/2014 |
| Camden City | Change of Address | |
| Clark | Handgun Permit | |
| Dumont | FID change of address | 12/26/2013 |
| East Orange | Handgun Permit | 2/18/2014 |
| Little Egg Harbor | Handgun Permit | 1/16/2015 |
| Elmwood Park | Handgun Permit | |

**Reported Delays by Municipalities**

| | | |
|---|---|---|
| Evesham | FID change of address, Pistol Purchase Permit | 9/18/2014 |
| Evesham | Handgun Purchase Permit | |
| Fair Lawn | Pistol Permit | 12/31/2013 |
| Fairview | FID, Pistol Permit | |
| Florham Park | Handgun Permit | 3/28/2012 |
| Florham Park | Handgun Permit | 1/3/2013 |
| Florham Park | Handgun Permit | 6/11/2013 |
| Florham Park | Handgun Permit | 1/7/2014 |
| Franklin Township | Handgun Purchase Permit | 1/18/2014 |
| Franklin Township | Pistol Purchase Permit | 12/3/2014 |
| Galloway Township | Initial Firearms Purchaser Card, Handgun Permit | 2/20/2014 |
| Glen Ridge | FID, Pistol Purchase Order | 2/15/2014 |
| Hackensack | Pistol Permits | July 2014 |
| Howell | P2P | |
| Jackson | Handgun Permit | |
| Jefferson Township | Pistol Purchase Permits | 2/18/2014 |
| Keyport | FID, Handgun Permit | |
| Lacey Township | FID change of address | |
| Madison | Handgun Permit | |
| Manalapan | FID | 8/7/2013 |
| Manchester | Handgun Permits | December 2014 |
| Medford | Handgun Purchase Permit | 8/28/2014 |
| Middlesex Borough | FID, Handgun Purchase Permit | 8/14/2013 |
| Middlesex Borough | FID, Handgun Purchase Permit | 8/14/2013 |
| Plainsboro | FID, Pistol Purchase Permit | 3/28/2013 |
| Millburn | FID, Handgun Permits | 12/17/2014 |
| Millville | P2P | 12/18/2014 |
| Montclair | FID | 11/15/2013 |
| Montville | Pistol Permit | 3/3/2014 |
| Mt. Arlington | FID, Pistol Permits | February 2013 |
| Mount Holly | FID, P2P | February 2013 |
| Mullica Hill | Change of Address, Pistol Permits | 11/23/2015 |
| New Brunswick | Handgun Purchase Permits | 11/28/2014 |
| Nutley | FID, Handgun Purchase Permit | June 2012 |
| Oak Ridge | Pistol Permits | 12/10/2013 |
| Oakland | Handgun Permits | 7/28/2015 |
| Old Bridge | Pistol Purchase Permits | April 2013 |
| Paramus | Pistol Permit | |
| Paterson | FID | |
| Pennsauken | Handgun Purchase Permit | |
| Phillipsburg | Pistol Permits | |

**Reported Delays by Municipalities**

| | | |
|---|---|---|
| Gloucester Township | FID | September 2010 |
| Gloucester Township | P2P | |
| Plainsboro | | 3/28/2013 |
| Point Pleasant Boro | Pistol Purchase Permits | |
| Rahway | Pistol Permit | |
| Rutherford | FID | |
| Scotch Plains | FID | 10/31/2014 |
| Scotch Plains | FID, Handgun Purchase Permit | 5/5/2014 |
| Scotch Plains | FID, Handgun Purchase Permit | 4/4/2014 |
| Summit | Handgun Permit | |
| Vernon | Pistol Purchase Permits | |
| Wall Township | FID, Handgun Purchase Permit | 12/20/2013 |
| Washington Township | Pistol Purchase Permits | 4/25/2014 |
| Waterford Township | Handgun Permit | 1/5/2015 |
| Wayne | FID change of address, Pistol Purchase Permit | 7/22/2013 |
| Wayne | Pistol Purchase Permit | 12/22/2013 |
| Weehawken | Handgun Purchase Permit | 12/12/2014 |
| West Deptford Township | Pistol Purchase Permit | |
| West Milford | FID | September 2012 |
| Wood-Ridge | Pistol Purchase Permit | |

**Reported Delays by Municipalities**

| Email sent/Permit dated | Length of delay | Reason (if any given) | Permit issued? (Y/N) |
|---|---|---|---|
| 4/9/2014 | 331 days | | N |
| | 18 months | | Y |
| 5/10/2014 | 99 days | | N |
| 2/28/2013 | 90 days | | Y |
| 4/24/2015 | 137 days | State police had not returned criminal record check; Hudson County had not returned mental health reacord check | N |
| 11/21/2014 | 74 days | | N |
| 1/21/2015 | 84 days | | N |
| 1/13/2015 | 116 days | | N |
| 8/14/2014 | 90 days | | N |
| 8/10/2015 | 7 months | | N |
| | 10 months | | N |
| 7/23/2013 | 123 days | | Y |
| 2/26/2014 | 79 days | | N |
| 4/27/2014 | 31 days | | N |
| 3/11/2014 | 526 days | Officer said he was swamped | N |
| 12/4/2013 | 200 days | Told to reapply for FID card | N |
| 2/6/2015 | 84 days | State police did not get info to township | Y |
| 6 months | | | N |
| 1/13/2015 | 32 days | | N |
| 1/11/2015 | 75 days | | N |
| 3/4/2014 | 139 days | | Y |
| 1/8/2015 | 6 months | | N |
| 7/9/2014 | 6 months | | N |
| 3/9/2014 | 4 months | | N |
| 2/28/2014 | 197 days | Waiting on paperwork from health department | N |
| 2/26/2014 | 134 days | | N |
| 5/28/2014 | 49 days | | N |
| 2/26/2014 | 2 months | Waiting on paperwork from health department | N |
| 7/25/2014 | 174 days | Mental health check | N |
| 5/14/2014 | 33 days | References never received forms | N |
| 5/5/2014 | 97 days | Fingerprint records lost | N |
| 1/7/2015 | 12 weeks | | |

**Reported Delays by Municipalities**

| | | | |
|---|---|---|---|
| 4/11/2014 | 35 days | | N |
| 2/10/2015 | 4 months | | N |
| 5/20/2014 | 4 months | | Y |
| 12/30/2014 | 40 days | Waiting on mental health check | N |
| 1/8/2015 | 16 weeks | | Y |
| 3/18/2014 | 8 months | | Y |
| 3/20/2014 | Told 2 months | | N |
| February 2014 | 3 months | | Y |
| January 2014 | 3 months | | Y |
| 2/25/2014 | 57 days | Told 4 months | N |
| 9/8/2014 | 91 days | | Y |
| 1/9/2015 | 78 days | | N |
| 4/29/2015 | 112 days | | Y |
| 4/15/2015 | 8 weeks | | N |
| 8/29/2014 | 99 days | | N |
| 8/14/2014 | 49 days | | N |
| 3/6/2014 | 12 weeks | | |
| 4/15/2014 | 60 days | | N |
| 10/28/2014 | 92 days | Claimed the state was the problem | N |
| 1/20/2015 | 10 weeks | Claimed the state was the problem | N |
| August 2013 | 7 months | Failed to send mental health consent form | Y |
| 3/13/2014 | 99 days | | N |
| 2/28/2014 | 13 months | Said they were backed up | Y |
| 8/26/2014 | 100 days | | N |
| 10/1/2014 | 42 days | | N |
| 1/24/2015 | 2 months | | N |
| 6/1/2015 | 5 months | | N |
| 1/24/2015 | 2 months | | N |
| 2/17/2014 | 27 days | | Y |
| 1/9/2014 | 8 months | | Y |
| 2/25/2014 | Told 5 months | | N |
| 3/29/2014 | 34 days | | N |
| 7/19/2015 | 1 year | | N |
| 9/25/2015 | 3 months | | |
| 3/3/2014 | 67 days | | N |
| 3/7/2014 | 17 days | | N |
| 2/25/2015 | 40 days | | N |
| 2/28/2015 | 4 months | | Y |

**Reported Delays by Municipalities**

| | | | |
|---|---|---|---|
| 1/26/2015 | 4 months | | N |
| 1/10/2015 | 3-4 months | | |
| 3/1/2014 | 60 days | | N |
| 3/30/2014 | 2-3 months | | |
| 5/30/2012 | 2 months | | Y |
| 4/29/2013 | 4 months | | Y |
| 11/1/2013 | 5 months | | Y |
| 2/28/2014 | 52 days | | N |
| 3/28/2014 | 69 days | | N |
| 1/19/2015 | 47 days | | N |
| 3/20/2014 | 28 days | | N |
| 4/14/2014 | 58 days | | N |
| 1/5/2015 | 9 business days | | Y |
| 7/14/2015 | 2 months | | N |
| 2/25/2014 | 90 days | | |
| 3/25/2014 | 35 days | | |
| 1/5/2015 | 1 year | | Y |
| 1/27/2015 | 12 weeks | | N |
| 12/4/2015 | Over 30 days | | N |
| 11/15/2013 | 100 days | | Y |
| 3/16/2015 | 3 months | | N |
| 11/16/2014 | 80 days | | N |
| 5/23/2014 | 282 days | | Y |
| February 2014 | 7 months | | Y |
| 7/16/2013 | 110 days | | Y |
| 2/18/2015 | 63 days | | N |
| 2/25/2015 | 69 days | | N |
| 3/14/2014 | 119 days | | N |
| 4/7/2014 | 35 days | | N |
| 3/6/2014 | 1 year | | N |
| 4/15/2013 | 2 months | | Y |
| 1/12/2016 | 50 days | Could not make appointment to sign forms | N |
| 1/27/2015 | 60 days | | N |
| April 2013 | 10 months | | Y |
| 3/6/2014 | 86 days | | N |
| 9/24/2015 | 58 days | | N |
| 2/27/2014 | 4 months | | Y |
| 1/23/2015 | 3 months | | N |
| 1/6/2015 | 8 months | | Y |
| 2/27/2014 | 3 months | | N |
| 1/22/2015 | 3 months | | Y |

**Reported Delays by Municipalities**

| | | | |
|---|---|---|---|
| September 2011 | 1 year | | Y |
| 2/25/2014 | 90 days | | Y |
| 7/16/2013 | 110 days | | Y |
| 1/11/2015 | 3 months | | Y |
| 2/25/2014 | 90 days | | |
| 10/21/2014 | 9 months | | Y |
| 1/6/2015 | 67 days | Missing form | N |
| 6/5/2014 | 31 days | | N |
| 6/9/2014 | 66 days | | N |
| 3/5/2014 | 2 months | | N |
| 3/4/2014 | 2-3 months | State police caused delay | Y |
| 7/8/2014 | 200 days | | N |
| 7/17/2014 | 83 days | | N |
| 2/8/2015 | 34 days | | N |
| 12/10/2013 | 141 days | | Y |
| 1/24/2014 | 33 days | | Y |
| 2/5/2015 | 55 days | | N |
| 4/23/2014 | 3 months | State police caused delay | N |
| 11/21/2012 | 2 months | | Y |
| 4/22/2014 | 52 days | | Y |