1                                 SUPERIOR COURT OF NEW JERSEY
                                 LAW DIVISION, CRIMINAL PART

2                                 SUSSEX COUNTY
                                 FIREARMS APPEAL NO. W31-13

3                                 A.D. #A-005505-13T1

4  IN THE MATTER OF:             )
                              )
                              )      . TRANSCRIPT

5  ISRAEL ALBERT ALMEIDA FROM   )          OF
   THE DENIAL OF HIS          )      HEARING

6  APPLICATION FOR A PERMIT    )
   TO CARRY                  )

7                        Place: Wilentz Justice Complex

8                             212 Washington Street
                             Newark, NJ 07102

9                      Date: June 18, 2014

10
   BEFORE:

11
    HON. N. PETER CONFORTI, J.S.C.

12
   TRANSCRIPT ORDERED BY:

13
    LOUIS P. NAPPEN, ESQ. (Law Office of Evan F. Nappen, PC)

14
   APPEARANCES:

15
   SHAINA BRENNER, ASSISTANT PROSECUTOR

16  Attorney for the State of New Jersey

17  EVAN F. NAPPEN, ESQ. (Law Office of Evan F. Nappen, PC)
   Attorney for the Defendant

18

19
                        Transcriber Eileen M. Zakrzewski

20                        G&L TRANSCRIPTION OF NJ
                        40 Evans Place

21                        Pompton Square Plaza
                        Pompton Plains, NJ 07444

22
                        Audio Recorded

23                        Recording Opr., Not Identified

24

25                   Exhibit "7"

| 1 | **Witnesses** | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|---|
| 2 | FOR THE DEFENDANT | | | | |
| 3 | Israel Albert Almeida: | 5 | 15 | | |
| 4 | By the Court: | 22 | | | |
| 5 | RECITATION OF FACTS: | | | | |
| 6 | By the Court: | 3 | | | |

| 7 | EXHIBITS: | Ident. | Evid. |
|---|---|---|---|
| 8 | A-1  Police Report dated June 11, 2013 | 9 | 26 |
|   | S-1  Chief of Police Denial Letter | | 26 |

| 9 | CLOSING ARGUMENT: | |
|---|---|---|
| 10 | By Mr. Nappen: | 27, 32 |
| 11 | By Ms. Brenner: | 29 |

| 12 | THE COURT: | |
|---|---|---|
| 13 | Decision: | 33 |

14

15

16

17

18

19

20

21

22

23

24

25

Sep 10 2014 9:09    P004/039

Case 2:16-cv-03411-KM-JBC  Document 1-7  Filed 06/13/16  Page 3 of 38 PageID: 71
Recitation of Facts - By the Court/Colloquy  3

1    THE COURT:  All right.  The Almeida matter.

2   Mr. Almeida made a -- as I understand it, was denied a

3   permit to carry a handgun by the Andover Township

4   Police Chief on October 24, 2013 because of the

5   department's position or the Chief's position.  Mr.

6   Almeida had not demonstrated justifiable need

7   consistent with the case law.  I've received the letter

8   from Mr. Almeida's counsel dated April 1 and the

9   State's response, their letter of May 23, 2014.  I've

10  also had the chance to review, I guess, what is

11  discovery material concerning Mr. Almeida's request and

12  he submitted, I believe a couple of letters to the

13  Andover Township Police Chief outlining history

14  invovling himself that in his view supports the

15  justifiable need criteria.  I don't think I'm dealing

16  with a constitutional issue since I think that's been

17  pretty much addressed in the federal courts.  So, I'm

18  really viewing this on the basis of a question of

19  justifiable need.  Are you Mr. Gilbert?

20           MR. NAPPEN:  Mr. Nappen.

21           THE COURT:  Oh, Mr. Nappen.

22           MR. NAPPEN:  Hi there.

23           THE COURT:  I didn't recognize you.

24           MR. NAPPEN:  I know, Judge, it has been a

25  little bit.

| 1 | THE COURT: You look a little different. |
| 2 | MR. NAPPEN: I do. |
| 3 | THE COURT: I probably do too. |
| 4 | MR. NAPPEN: Yes. First of all, good |
| 5 | morning, Your Honor. |
| 6 | THE COURT: Good morning. |
| 7 | MR. NAPPEN: Second of all, I apologize for |
| 8 | the delay even building in 45 minutes of extra time, |
| 9 | 287 North did not let me down and required double that |
| 10 | amount of time. |
| 11 | THE COURT: You and your client can have a |
| 12 | seat -- |
| 13 | MR. NAPPEN: Thank you. |
| 14 | THE COURT: -- you don't have to stand up. |
| 15 | MR. NAPPEN: But Your Honor, is right. The |
| 16 | Constitutional argument was argued and preserved as far |
| 17 | as I'm concerned in the brief so that it's there. But |
| 18 | today, we will -- our -- our presentation is focused on |
| 19 | justifiable need and why Mr. Almeida does qualify under |
| 20 | the traditional approach of justifiable need. |
| 21 | THE COURT: Okay. |
| 22 | MR. NAPPEN: Thank you, Your Honor. |
| 23 | THE COURT: Did you wish to have -- |
| 24 | MR. NAPPEN: I would -- |
| 25 | THE COURT: -- your client testify? |

1          MR. NAPPEN:    -- yes, I do.  Thank you, Your

2  Honor.

3          THE COURT:  All right.

4          MR. NAPPEN:  If I may.

5          THE COURT:  Mr. Almeida, if you'll come up to

6  the witness stand over there.  If you could -- there

7  should be a Bible there.  If you could place your left

8  hand on the Bible, raise your right hand.

9  I S R A E L   A L B E R T   A L M E I D A DEFENDANT,

10  SWORN

11          THE COURT:  Have a seat.  Just begin by

12  stating your full name, for the record.

13          MR. ALMEIDA: Israel Albert Almeida.

14          THE COURT:  Mr. Nappen.

15          MR. NAPPEN:  Thank you, Your Honor.  May I

16  please the Court.

17  DIRECT EXAMINATION BY MR. NAPPEN:

18     Q.  Okay. Mr. Almeida, if you could -- first start,

19  tell us what -- what is your employment.  What do you

20  do?

21     A.    I own and operate a small business, it's a

22  property management fir -- business.  It deals with

23  property management, obviously, construction, tenant

24  rent collection, lease management.

25     Q.    And, what do you do in regards to those

1   issues, what is the actual physical work that you do?

2   A.    The primary function is lease management, tenant

3   management and rental collection.

4   ·Q.    So, what's involved in that?  What do you

5   actually to -- to do?

6   A.    Interviewing tenants, placing them in -- in

7   housing, collecting rents, disbursing the funds to my

8   customers, which are the apartment of home owners.

9   They -- they are my customers.  Lease management would

10  be also dealing with any tenant related issues, any

11  apartment related or home related issues.  Those issues

12  can be maintenance, dealing with vacant property,

13  securing them.

14  Q.    And, where are these properties located?

15  A.    Overwhelming majority of them are in Essex County,

16  Newark and Irvington.  I would say 99 percent of them

17  are located in that area.

18  .Q.    ·  Okay.  And about how may tenants do you have

19  that you service?

20  A.    Approximately 40 to 60 units.

21  Q.    And could you describe the areas where these

22  tenants' properties are?

23  A.   Officially or unofficially?

24  Q.    No, just in your experience.  In your

25  observations.

1    A.    They are -- a majority of them are in rough areas.

2    Areas that are high crime areas.  High -- high crime

3    areas, low income, section 8 tenants.  Those are the

4    majority of the areas that I -- that I deal with.  A

5    gang -- a lot of gang related crimes in the area.

6        Q.    Now, you understand that one of the criteria

7    for obtaining a license -- a permit to carry is what's

8    called justifiable need, right?

9    A.    That's correct.

10       Q.    And you understand that that entails

11   regarding threats to your personal safety, et cetera,

12   right?

13   A.    Correct.

14       Q.    Have you experienced anything in line of

15   threats to your person?

16   A.    Yes, I have.

17       Q.    Okay.  Could you talk about any examples of

18   that?

19   A.    There are multiple examples.  The main example is

20   why are we here today, because of an incident that I

21   did have with a tenant about a year ago who is an

22   admitted gang member, a career criminal who served

23   prison time for aggravated assault.  The threatened my

24   life.  He threatened my life as long as I live in New

25   Jersey.  He stated that, you know, he'll get me

1  regardless of how long it takes and if it's not him it

2  will be his street crew because he -- he admitted that

3  he was a -- a street gang member.

4      Q.    What's his name?  What is the individual's

5  name?

6  A.    It should be in the police report.  I believe

7  there should be two names there including an alias.

8  And -- but besides that incident there have been

9  several other incidents.  More suggestions when I

10  approach the area, I am accosted by individuals asking

11  me what am I doing in the area.  If I can give them

12  some money because they know that I'm carrying money.

13  They know that I'm there to collect rents.  Just

14  recently in the last week of April I was scheduled to

15  respond to one of my properties for a maintenance

16  issue.  A few minutes before my arrival there was a

17  shooting out front, an attempted robbery of an

18  individual and they ran into the back yard of my

19  property where they continued shooting at the

20  individual attempting to rob him.  That was only within

21  15 minutes of -- before my arrival.  There have been,

22  you know, several remarks made, better -- what you got

23  in there, what kind of mon -- how much money you got,

24  let me get some of that money.

25          MR. NAPPEN:    Let me show counsel the police

1    report.    Thank you.  Your Honor, my I approach --

2                THE COURT:   Yes.

3                MR. NAPPEN:  -- and have this marked?   Thank

4    you.

5                THE COURT:   I guess it can be marked A-1.

6    BY MR. NAPPEN:

7    A.    Also, I'd like to add that --

8                THE COURT:   Hold on.

9                MR. NAPPEN:  Thank you.

10   BY MR. NAPPEN:

11        Q.    Mr. Almeida, I'd like you to take a look at

12   what's been marked A-1.  Do you recognize that

13   document?

14   A.    Yes, I do.

15        Q.    What is that?

16   A.    This is the police report that I filed the day of

17   the -- the threats made against me.

18        Q.    And what date was that?

19   A.    It was in June and it should be stamped June 11,

20   2013.

21        Q.    Okay.  And, do you remember who you spoke to

22   at the police?

23   A.    It was -- it was the officer that was at the desk

24   there at the north district.

25        Q.    And -- and what did you go there specifically

1   to file a complaint about -- file a report about,

2   sorry?

3   A.    I -- because I took those death threats against my

4   life serious and I advised the tenant that I was going

5   to file a death threat report. And his response to me

6   was go ahead. I'll shoot the police also. So, I took

7   this individual very serious due to my former line of

8   work and the exposure that I've had with this -- these

9   type of incidents. So, I went immediately to the

10  Newark Police Department which is the north district

11  not too far from this -- from this residence to file

12  this police report.

13       Q.    What were the specific threats that were made

14  against you?

15  A.    There were several. I believe only one or two of

16  them made it onto the police report. I assume it's

17  because they did not have enough space. But there was

18  about 15 of them and --

19       Q.    What were they? Say them specifically that

20  were made against you. What were they?

21  A.    Specifically were I will -- "I am going to put a

22  cap in your head, you white fag." Excuse my language,

23  but I'm just -- what was directly stated to me. "I

24  will get you on a dead end street where the police

25  don't come around and no one will see it." "I will

1  make it look like a robbery and dump your body on the

2  dead end street and nobody will catch me." Also,

3  several references of putting a bullet -- bullet in my

4  head. And also several references made "I know where

5  you have to go collect the rents. I know what type of

6  vehicle you drive. I know what you got to do out here.

7  As long as you live in New Jersey you're no longer

8  safe. And if I don't get you, my boys will." And then

9  he went on to say "you messed with the wrong street

10  nigger. And I'm a gangster. And you will get yours

11  eventually."

12      Q.   What -- do you know what lead him to make

13  these threats against you?

14  A.   We had taken over the property. The customer is

15  -- lives out in New York. We had taken over the

16  property the first week of June, June 1st, I believe.

17  And I went over there to introduce myself as the new

18  property manager and that we -- any problems with the

19  property, he would be dealing with me directly. Giving

20  him basically my information, phone number, emergency

21  contact number. And then we discussed the lease. We

22  discussed the rent. He advised he that he did not have

23  the rent money to give him a few days. I said okay,

24  not a problem. We'll give you a few -- you know, a few

25  days. On the fifth of the month which was June 5th, I

1  reached out to the individual again. Hey, how -- how

2  are you doing with the rent? And that's when he

3  started getting aggravated 'cause I already had called

4  him a second time on the third which was the third

5  contact that I had with the individual was on June 11th

6  and I advised him the lease states you have to pay up

7  to the fifth. The customer and because of the lease we

8  have to file for an eviction any time rent is not paid

9  after the fifth. And we could always cancel the

10  eviction as long as the rent is paid. And that is when

11  he started with his threats. And I advised him what

12  the eviction process did if he does not cooperate, we

13  will have to file for a warrant or removal. I

14  basically was explaining the steps to him on the

15  eviction process. And that is when he proceeded with

16  "well, go ahead. I'll put a bullet in your head." And

17  that's when I advised him, I took that threat serious

18  so I'm gonna notify the police.

19      Q.   No, you -- you said based on your former

20  experience or employment, what was that former

21  experience or employment --

22  A.     I served --

23      Q.   -- you referenced?

24  A.     -- I served the City of Newark as an emergency

25  medical technician since 1989. I am no longer

1    certified as an EMT.  But I was an emergency medical

2    technician since 1989 and 15 of those years I served as

3    the lead medic on emergency response team with the

4    Newark Squad team.

5          Q.   So, you dealt with how many individuals as

6    you say --

7    A.   I've dealt with many individuals.  I've seen

8    everything out there that evil, you know, an do to an

9    in -- innocent bystander.  I've seen shootings,

10   stabbings not only of adults but of children, two weeks

11   old.  I've been a victim of crime myself even during,

12   you know, the work.  We've been shot at in the

13   ambulance.  We've been -- I've been personally stabbed

14   on an emergency call in the mid '90's because of a

15   domestic dispute that we walked into for an emergency

16   call.  The 15 years that I served as the lead medic for

17   the emergency response team which is the -- also known

18   as the swat (phonetic) team for the Newark Police.

19   The majority of that were high risk narcotic warrants

20   and homicide suspects warrants.

21         Q.   What is your family background, are you

22   married, do you have children, what is your --

23   A.   I'm married to                    (phonetic) she

24   is a

25                                                I have a

1   | 5 year old daughter,     (phonetic) and I have a 2

2   | years old daughter,

3   |     Q.   Now, in addition to this threat you discussed

4   | that you filed, were there -- have there been other

5   | threats, other than that threat?

6   | A.    There have been suggestions made.  There have been

7   | attempts of -- of car jackings made where I have been

8   | force to leave an area because I noticed the danger of

9   | the threat approaching.  There have been basic verbal

10  | treats of, you know, I'm going to kick your ass, in

11  | that nature.

12  |     Q.   So, do you think having a handgun would be

13  | necessary for you?

14  | A.    I deal in a very dough area.  My -- my work area

15  | is like I -- I mentioned earlier the majority of it is

16  | Newark and Irvington.  These areas are very high crime

17  | areas, well known for gang activity.  Well know for

18  | narcotic activity.  The overwhelming majority of my

19  | business requires either rental collection which could

20  | -- majority it's high -- deals with cash.  It's not

21  | direct deposit or it's not with -- with checks or money

22  | orders.  And because of that I am constantly viligent

23  | because the threat is out there.  And I know that it is

24  | just a matter of time before I am attacked, robbed --

25  | because they know what I'm doing there.  They know the

1   business that I'm conducting in this area.

2        Q.   And just for purpose of background, even

3   though we're focusing on justifiable need, what is it

4   -- what training or experience do you have with a

5   firearm?  You're qualified under the statute --

6   A.   I have extensive experience -- I qualify.  As you

7   can see, I have the qualification's record there of one

8   hundred percent.  I have several NRA training

9   certificates.  I am also a certified range safety

10  officer with the NRA as well.

11        MR. NAPPEN:  Nothing further.  Thank you,

12  Judge.

13        THE COURT:  Cross examination.

14  CROSS EXAMINATION BY MS. BRENNER:

15        Q.   Good morning Mr. Almeida.

16  A.   Good morning.

17        Q.   Now you said that part of your

18  responsibilities, as part of your line of work is

19  rental collection.  How do you go about collecting rent

20  from your tenants?

21  A.   We -- I collect rents, issue them receipts and the

22  -- those rent collections are actual house calls to --

23  to the apartment -- to the tenant -- with the tenant.

24        Q.   And you go door to door?

25  A.   Yes.

1       Q.   And, you said that the way that they paid was

2    in cash?

3    A.   The majority of it is in cash, correct.

4       Q.   Do any of your tenants pay by mail?

5    A.   No.

6       Q.   Or by check?

7    A.   Very little.

8       Q.   And, why do the -- is the rents due in cash?

9    A.   A majority of the time it's because that's their -

10   - that's their lifestyle.  That's their living

11   condition.  They do not have a bank account.  They do

12   not have means of paying me any other way but with

13   cash.

14      Q.   And have you ever required tenants to deposit

15   the cash and make out a money order or a rent check?

16   A.   We have attempted to get that done.  We just find

17   it extremely difficult.  If we ask them to go to a bank

18   and deposit it a majority of the time they do not do it

19   and their excuse is they do not have the means to get

20   to the bank.  Or they do not have the means to -- to

21   get a money order because they are either -- they have

22   no transportation.  They may be elderly, handicapped.

23   They just do not have the means to pay any other way

24   but with cash.

25      Q.   And, if -- when they're paying cash are you

1  carrying the cash with you?

2  A.    Absolutely.

3       Q.    How much money are you carrying with you as

4  you're going door to door, typically?

5  A.    It could be anything between $5,000 to $13,000 --

6  $5,000 to 15 -- to $13,000.

7       Q.    And do you carry that with you throughout the

8  day, or do you go to the bank in between?

9  A.    I installed a safety lockbox in my vehicle that I

10 place the -- the cash.  It would not be convenient to

11 go to the bank after every single transaction just

12 because of the distance and the time constraints.

13      Q.    And, you said that you were threatened and

14 you mentioned the specific incident in which you were

15 threatened with this particular tenant.  Did that

16 tenant eventually pay the rent?

17 A.    No.

18      Q.    And, is he still currently a tenant at your ;

19 one of your properties?

20 A.    He is no longer at one of my properties, but he

21 resides five houses down from another property that I

22 manage.

23      Q.    And have there ever been physical

24 confrontations between you and any tenants who were --

25 any -- anyone in the surrounding vicinity?

1  A.    I immediately withdraw myself from that situation.

2          Q.    And after you were threatened by this

3  particular individual, have you taken any precautions

4  or changed the manner in which you collect rent in any

5  way?

6  A.    I do all the time just because of my past

7  experience in -- in -- in -- in -- I -- but there are

8  only so much that you can do.  You could try to meet at

9  different times of the day, but there's really no day

10 that's -- hour of the day that's safe.  I am always

11 viligent and that is because of my past training.   I

12 know how to recognize danger.  If I can avoid it, I

13 will.  It does not mean that I'll be successful all the

14 time.

15         Q.    So, what specific precautions have you taken?

16 A.    If I see a large gathering in front of a property

17 that I'm responding too, maybe I'll go around the block

18 or come back another time, if possible -- if it's

19 possible.  That is one of the measures.  I -- you know,

20 avoid confrontation as much as possible.  But at all

21 times I avoid confrontations.  It's not [sic] as much

22 as possible every time.

23         Q.    And have you considered at all hiring, I

24 guess, some type of security in order to accompany you

25 as you go to collect these payments?

1    A.    In order to hire security I would have to increase
2    my fees and increase the rents, that would put me out
3    of business, ma'am.

4         Q.    And as part of your precautions have you been
5    -- have you changed any of the, I guess, as I might
6    have stated before and as you stated before with regard
7    to the manner in which rent is being paid and the
8    payments are being made to you?

9    A.    Again, it goes back to the beginning.  It is up to
10   the tenant how they -- they -- they pay.  I cannot
11   force them to go get a bank account.  I cannot force
12   them to go and drive to a bank and deposit.  If they
13   tell me they do not have that mean, they do not have
14   that mean.  I wish I could, but it's in -- there's
15   restraints there and a majority of the time it's
16   impossible.

17        Q.    Huh hum.

18   A.    So, I would have to accept what -- what is given.

19        Q.    Now, have there been any recent threats?  I
20   know you mentioned there was something in April?

21   A.    April 28th, there was a shooting in front of one
22   of my properties,                          Newark where
23   they attempted to rob an individual that was walking in
24   front of my property.  This individual ran to the back
25   yard of the property where two gunmen chased after him

1   and continued shooting at my property and at this

2   individual attempting to rob him. Recently on the

3   intersection of South 15th and 18th Avenue, I was

4   sitting at a red light going to a home inspection

5   appointment and five individuals on bicycles approached

6   my vehicle laughing. One individual attempted to open

7   up my door. I took that as a possible an attempt of

8   car jacking where I was forced to run the red light and

9   flee the area. And these individuals chased after me,

10  I'd say maybe a hundred feet on their bicycles and

11  obviously in my vehicle I took off.

12       Q.   Now those individuals, did they recognize

13  you?

14  A.   I -- I -- I do not know.

15       Q.   But they weren't tenant. You didn't

16  recognize them as tenants?

17  A.   No. They were individuals on bicycles.

18       Q.   And those were the most recent threats. One

19  was the incident where it happened in the vicinity that

20  you were at but not specific to you, correct?

21  A.   And then there are multiple times when I

22  approached --

23       Q.   Oh, I'm sorry, I just -- I just wanted to

24  clarify that incident that -- that happened --

25  A.   These two are --

1    Q.  -- in the vicinity where you were --

2    A.  -- the most recent ones, correct.

3    Q.  -- that wasn't a threat to you?

4    A.  I took it as a threat, absolutely.

5    Q.  Oh, okay.  So, they did make their presence

6    known to you or -- or threaten you?

7    A.  Five individuals --

8    Q.  Did they speak with you?

9    A.  -- approached me on bicycles, one individual

10   attempted to --

11   Q.  Oh, no, not that threat.  I meant the -- I'm

12   sorry.  I -- I was getting confused.  I meant the

13   incident in which you stated that in April there was a

14   shooting on the property near you?

15   A.  That was -- I -- that was possible a random

16   attempted robbery.

17   Q.  Okay.  I just wanted to clarify.

18   A.  No.

19   Q.  And then you were continuing saying --

20   A.  It just happened to be that it occurred as I was

21   in route to that -- that -- that facility for

22   maintenance.

23        MS. BRENNER:  Your Honor, I have no further

24   questions.

25        THE COURT:  Anything further, Mr. Nappen?

1       MR. NAPPEN:  Nothing further.  Thank you,

2   Judge.

3   BY THE COURT:

4       Q.   Mr. Almeida, with regard to this incident for

5   which you filed the police report in June 11 of 2013,

6   you've told us that this person has relocated.  Did you

7   evict that individual?

8   A.   Yes.  We did preform the eviction, correct.

9       Q.   In other words you filed a -- a complaint in

10  landlord tenant court in Essex County?

11  A.   That's correct.

12      Q.   Did the individual appear?

13  A.   No, he did not.

14      Q.   So, in order for possession or judgment of

15  possession was granted and a warrant for removal --

16  A.   That's correct.

17      Q.   -- issued?

18  A.   That's correct.

19      Q.   And did the constable remove the individual?

20  A.   That -- when we arrived the day of, actually I did

21  not show because of the threat.  The constable called

22  me up on the phone and said the individual -- ah, they

23  gained entry into the apartment and it appears that

24  they abandoned the apartment.  There was no signs of

25  anyone else living in there.

1    Q.   So, when the warrant was executed no one was

2  there?

3  A.    No one was there.

4    Q.   And, do you know or recall off hand when it

5  was that that warrant was executed?

6  A.    It -- in Essex County it -- it's -- it's

7  approximately a 2 -- 2 month waiting period just

8  because of, you know, so many -- so many cases.  It was

9  mid August.

10    Q.   Of 2013?

11  A.    That's correct.

12    Q.   All right.  Since the warrant was executed,

13  have you had contact with this person?

14  A.    No, I have not had contact with this person.  I am

15  told that he resides five house away from another

16  property at a different location.  I am told that he

17  has asked about me.  If I have come around.

18    Q.   Well --

19  A.    But I have not --

20    Q.   -- you were told that by somebody else I

21  gather?

22  A.    Someone else that's familiar with the -- with the

23  incident, familiar with the in -- the individual?

24    Q.   But there's been no direct contact by this

25  person with you?

1    A.    That's correct, no.

2          Q.    And you say from your information he resides

3    about five dwellings from where your property is

4    located?

5    A.    That is what I'm told, correct.

6          Q.    This -- this would be the property that he

7    was previously residing?

8    A.    No, this is at a -- another location.

9          Q.    Another location.

10   A.    Correct.

11         Q.    So, there's been no contact directly between

12   you and this person since the incident in June of 2013?

13   A.    That's correct.  The Newark Police attempted to go

14   locate him to -- to bring him in and they were not able

15   to -- to make contact with the individual.  And in

16   fact, their exact words to me were, why do you not --

17   why don't you go to his house and pretend that you're

18   gonna discuss the lease and if he's him call us back so

19   we can go get him.

20         Q.    But they know who it is?

21   A.    I believe so.  Correct.

22         Q.    And, you have not pushed the incident any

23   more with the police in trying to apprehend this

24   person?

25   A.    That is correct because I am told the last contact

1    I had with the detective was that they cannot locate

2    him and they left it at that. They did not seem

3    interested.

4        Q.   But they -- did you let them know that he may

5    be living five dwellings away from one of your --

6    A.   Correct.

7        Q.   -- properties?

8    A.   Correct.

9        Q.   But there's been no --

10   A.   There's been no contact.

11       Q.   -- no contact. And, have any other

12   individuals approached you about this person?

13   A.   Not about this individual, no.

14       Q.   Okay. With the tenants that you do have,

15   have there been any other incidents in which tenants

16   have made similar threatening comments to you?

17   A.   Not necessarily tenants. But I would assume they

18   are family members or guests of tenants that are

19   residing in the buildings. When I enter the building,

20   they have said, here comes the money man. Let me get

21   some of that cash. I know you have a lot of it. What

22   are you doing around here, you know you don't belong

23   here. Statements like that have been made.

24       Q.   I see. All right. Thank you, Mr. Almeida,

25   you can step down.

1   A.    Thank you.

2                    (Witness is excused)

3

4             THE COURT:   Any other evidence to submit, Mr.

5   Nappan?

6             MR. NAPPEN:   Thank you, Your Honor. Nothing

7   further, I just ask that A-1 be made into the record.

8             THE COURT:   Any objection, Ms. Brenner?

9             MS. BRENNER:   No objection, Your Honor.

10            THE COURT:   All right.  You can give it to

11  the clerk to mark in evidence.

12            MR. NAPPEN:   I will.  Thank you, Your Honor.

13            THE COURT:   Does the State have any evidence

14  to present?

15            MS. BRENNER:   No, Your Honor, although if

16  there's no objection, I -- I have the letter of denial

17  from the Chief of Police and that I would like to move

18  into evidence, unless the Court already has a copy.

19            THE COURT:   Well, I have the letter of

20  October 24, 2013 --

21            MS. BRENNER:   OH, that's the letter, Your

22  Honor.  Then I withdraw my application.

23            THE COURT:   That could be considered by the

24  Court as S-1 in evidence.

25            MR. NAPPEN:   There would be no objection,

1    Your Honor, part of the process.

2              THE COURT:  Mr. Nappen.

3              MR. NAPPEN:  Thank you, Your Honor.

4              THE COURT:  You can have a seat, Mr. Nappen.

5              MR. NAPPEN:  I like to make losing argument.

6    And that is, it's been said that a -- a gun is like a

7    parachute because if you need one and don't have one,

8    it's highly unlikely you'll ever need one again.  And

9    this is kind of the conundrum that presents itself in

10   these cases.  It's plain that he is subjected to

11   threats and that he's in a dangerous area and has been

12   given specific threats against him which are police

13   record.  That he's a target given the amount of money

14   and cash and even his very presence in a place where he

15   is challenged and yet has to be there to do his job.

16   The standard for justifiable need was at -- is actually

17   codified in the administrative code.  And that it's

18   N.J.A.C. 13:55-2.4 and it defined justifiable need as

19   the urgent need of self protection due to specific

20   threats or previous attacks posing at special danger to

21   an applicant's life.  The price criteria is actually

22   applied to security guards and to private eyes, et

23   cetera.  The urgent necessity requirement has been the

24   traditional requirement in New Jersey and it's that

25   special danger in effect is the issue and that's

Sep 10 2014 9:09    P029/039

1  demonstrated by these threats.  It's a special danger

2  to him because of what he uniquely does.  The position

3  that he's in, in having to do it.  To say that he would

4  hire security is kid of funny in a way because that

5  security would be armed and would have to have met New

6  Jersey's standard. And to suggest that that's an

7  alternative suggests that the standard is there for

8  having the issuance of a license to him.  Because if

9  security is what's necessary and they're armed to

10  protect him, they have to meet the standard as well.

11      He is responsible for his life.  He has a

12  family, et cetera.  But beyond that, and I know in our

13  brief we raise the Constitutional issue is that we're

14  not -- that we were just preserving, but not arguing

15  from that.  But there is a point to the Constitutional

16  issue that I think has not been raised much. And that

17  is that Heller not only in finding a Second Amendment

18  right to bear arms and the question of whether -- how

19  it applies, you know, to the bearer part outside the

20  home.  Without getting into that, there's another

21  element. And that is, the court also found there's a

22  right to self defense.  That's another part of Heller

23  a right to self defense.  Mr. Almeida has a right to

24  self defense.  And he as right then to the means of

25  self defense which even in looking at New Jersey's

1   test, he's represented the danger, the threats and what

2   he does in his special capacity, not an average citizen

3   that may have to go to Newark, this is what he does.

4   This is what he faces. He has these threats and he has

5   a Constitutional right to self defense. He needs the

6   means to be able to defend himself. Because this

7   hearing today will stand in effect as a record of his

8   attempt to do that very thing. And if he's denied his

9   parachute and he needs one, how does the question get

10  answered after that? What do we tell his daughters why

11  he was denied the means? How do you answer that? I

12  don't know. I don't know what -- it would be a very

13  difficult thing to have to do and I hope we don't have

14  to do that. He should be able to defend himself. He's

15  trained. He faces the threats. He's met the standard

16  and he has a Constitutional right to self defense. And

17  I would ask that Your Honor grant this permit in the

18  scope of the capacity of what he does. You know, it

19  can be narrowly tailored, but make it so he has that

20  ability during those times to do what he needs to do

21  safely. Thank you, Your Honor.

22          THE COURT: Thank you, Mr. Nappen. Ms.

23  Brenner.

24          MS. BRENNER: Thank you, Your Honor. I'll --

25  I'll rely on what was submitted to the Court in my

1   brief. However, just briefly I'll state that it's the

2   State's position the defendant has not met the standard

3   under justifiable need. Well, there does need to be an

4   urgent necessity for protection under the statute.

5   Another part of that statute reads that -- that such

6   danger cannot be avoided by other means. And, in this

7   case, based on the testimony provided by Mr. Almeida,

8   it's the State's position that this -- these threats

9   can be avoided. The manner in which the rents are

10  collected by carrying large amounts of cash without

11  stopping you know to deposit the money at a bank by not

12  accepting checks or requiring tenants to pay by check

13  or by mail, there are options in which the defendant

14  has from other means.

15          THE COURT:  What statute are you relying

16  upon?

17          MS. BRENNER:  Oh, just -- that's New Jersey

18  statute -- it's the administrative code --

19          THE COURT:  No --

20          MS. BRENNER:  -- 13 -- 13:54-2.4(d)(1).

21          THE COURT:  Well, that hasn't been submitted

22  to me, but I have what Mr. Nappen cited on page 5 of

23  his letter. But the other -- did you submit anything

24  from the administrative code?

25          MS. BRENNER:  I believe it's in my brief on

1    page three, Your Honor.

2          THE COURT:  That was I think the

3    provisions --

4          MS. BRENNER:  It's the same provision as --

5    that's cited on page 5 of defense counsel's brief.

6    Which again, I was just pointing to the part where it

7    says cannot avoided by other means.

8          THE COURT:  Oh, all right.  I see what

9    you're saying.  Okay.  So, basically the State's

10   argument is there are -- there are alternatives for

11   this individual given the nature of the work that he's

12   elected to pursue?

13         MS. BRENNER:  Yes, Your Honor.  And that his

14   occupation should not be considered -- or used to

15   determine whether a carry permit should be issued in

16   this case.

17         THE COURT:  There were -- there was a case

18   involving bail agents or some --

19         MS. BRENNER:  Fugitive recovery agents, yes,

20   Your Honor.

21         THE COURT:  Fugitive recovery agents.

22         MS. BRENNER:  Huh hum.  And it's In re

23   Borenski (phonetic), I believe that's also in my brief,

24   Your Honor.

25         THE COURT:  Where they were actually shot at?

1          MS. BRENNER: Yes, Your Honor, where they

2   were shot at. They had been threatened with a variety

3   of weapons and did carry a large amount of cash. I --

4   I referenced it briefly on page 4 of my brief.

5          THE COURT: Yeah, it's 363 New Jersey

6   Super --

7          MS. BRENNER: 10.

8          THE COURT: -- page 10, an Appellate

9   division --

10          MS. BRENNER: From 2003.

11          THE COURT: -- 2003 decision.

12          MS. BRENNER: Yes, Your Honor.

13          THE COURT: All right. Was there anything

14   further you wanted to emphasize?

15          MS. BRENNER: No, Your Honor. The State

16   rests.

17          MR. NAPPEN: Thank you, Judge.

18          THE COURT: Did you want to say --

19          MR. NAPPEN: I'd just point out that the

20   alternate means argument of the State that's why I'm

21   talking about if it's hiring security guards then

22   they're already meeting the standard. So, there really

23   is not an alternate means for him. And, I would point

24   out that Borinski, Price, the others are pre Heller,

25   they are cases that were decided under Burton v. Sills

Sep 10 2014 9:09     P034/039

Case 2:16-cv-03411-KM-JBC   Document 1-7   Filed 06/13/16   Page 33 of 38 PageID: 101
          Nappen - Closing Argument/The Court - Decision  33

1   (phonetic) where there was no recognition of a second

2   amendment at all in New Jersey and it was deemed

3   strictly a privilege. <u>Heller</u> has made it clear there's

4   a right to self defense and whether or not New Jersey's

5   test stands for -- Constitutionally or not is another

6   issue for talking here, not actual threats from this

7   individual meeting the administrative standard.  Thank

8   you, Judge.

9         THE COURT:  All right.  Well, I gather the

10  Constitutional issue was settled so to speak by reason

11  of a third circuit's decision in <u>Drake vs. Filco</u> at 724

12  F.3d 426 which -- for which there was a petition of

13  <i>certiorari</i> to the United States Supreme Court which was

14  denied.  Now, there's always a right of self defense

15  regardless of any of these cases.  An individual

16  certainly has a right of self defense.  The question

17  here is, is there a substantial threat of serious

18  bodily harm in the carrying of a handgun therefore is

19  necessary to reduce the threat of unjustifiable --

20  unjustifiable serious bodily harm.  There are a couple

21  of points that I would note here.  Mr. Nappen is

22  emphasizing the self defense argument because under the

23  <u>Price</u> standard of justifiable need, I -- I dare say I

24  find the argument lacking in terms of how a handgun

25  will reduce the threat of unjustifiable serious bodily

1   harm.  Because if anything, the presence of a handgun

2   can in a certain sense cause the -- an increase in

3   terms of -- of bodily harm.  If individuals become

4   aware as -- and Mr. Almeida is indicating that

5   everybody in the neighborhood knows what he's doing if

6   they become aware that he's carrying a handgun there is

7   the potential for an increase in violence in that

8   context.

9              So, I -- I question whether the second part

10  of the Price standard is truly met.  The administrative

11  code which has been cited to the Court sug -- also

12  indicates that the individual has to in -- employ means

13  other than the issuance of a hand gun permit if that

14  can be done.  Here other methods are suggested in terms

15  of the collection of rent through checks, through money

16  orders.  Through depositing of funds in a bank account.

17  And as Mr. Almeida testifies, these are not especially

18  convenient or profitable for him in terms of the nature

19  of the business that he has chosen to pursue after

20  leaving his prior employment.  But there -- these means

21  are available to him in terms of rent collection.  And

22  I can understand the practicalities of the situation

23  because the -- the owners are looking to maximize their

24  investments certainly.  He's looking to maximize his

25  profit so the question is how best to do that?  That

1   is the least expensive way so to speak to accomplish

2   those goals. And, it -- as it turns out its cash

3   collection of rent in areas that he describes as being

4   high crime areas, gang infiltrated areas. It's a risky

5   business so to speak in terms of what he has chosen to

6   pursue. But, still, the question becomes substantial

7   threat of serious bodily harm. I guess the focus in

8   terms of the first prong of the test is on the word

9   substantial. I questioned him about this particular

10  individual against whom he filed this police report

11  which is A-1 in evidence. Apparently after these

12  initial verbal threats were made to him, that

13  individual, I gather was evicted as a result of a

14  dispose action that he initiated and when the warrant

15  for removal was executed, no one was there. Now, the

16  question is, where is this person in terms of

17  presenting a continuing threat to Mr. Almeida.

18  Apparently, there's been no contact by this individual

19  with the defendant for approximately a year. The

20  defend -- Mr. Almeida indicates that he's heard that

21  the individual is still looking for him. Or, that his

22  gang, if you will, is still aware of Mr. Almeida's

23  presence.

24          Frankly, it would help his case for specific

25  -- rather for a substantial threat to have some

1    evidence that would address that particular issue.

2    Because I think that would lend substance to what Mr.

3    Almeida is arguing to the Court by this application.

4    But, in term -- and the Court would also make note of

5    the fact that Mr. Almeida has indicated with regard to

6    other tenants in -- in these facilities, that these

7    people are aware of what Mr. Almeida does, why he's

8    there.  In fact, they've told him, according to him,

9    that he has no business being there.

10           So, while a threat was given to the -- Mr.

11   Almeida, the question is, is it a substantial threat as

12   apposed to an individual having been contacted three

13   times by Mr. Almeida looking for payment of rent and

14   then becoming frustrated apparently and verbally

15   lashing out at him threatening to kill him, a he's

16   described.

17           I think more has to be demonstrated to

18   indicate a substantial threat exists without there

19   having been any further contact by this person with Mr.

20   Almeida.  And secondly, I would note under the

21   administrative code that's been cited, there are other

22   means that he can employ they may not be the most

23   profitable under the circumstances, but they do exist

24   in terms of rent collection in which he's engaged.

25           And, generally speaking in electing to engage

 1  in this type of line of work and putting himself in --

 2  in this particular area, he's done the voluntarily of

 3  his own accord. But, in doing that he has to be

 4  mindful of the requirement of justifiable need for a

 5  per it to carry a handgun to be issued and if one -- if

 6  -- if a handgun was in his possession given his

 7  description of the neighborhood, the question exists as

 8  to whether that would really reduce the threat of

 9  unjustifiable -- unjustifiable serious bodily harm or

10  potentially increase it.

11        So, for these reasons, the Court will deny

12  the application and ask the State to submit the

13  appropriate order.

14        MS. BRENNER: Yes, Your Honor.

15        THE COURT: The exhibit that Mr. Nappen

16  submitted can be returned to him.

17        COURT CLERK: Should I make a copy of it

18  Judge?

19        THE COURT: We have it in the file.

20        COURT CLERK: Okay.

21              (Off record).

22

23

24

25

1                          Certification

2    I, Eileen M. Zakrzewski, the assigned transcriber, do

3    hereby certify the foregoing transcript of proceedings

4    on CD Rom, time from 10:04:47 a.m. to 10:51:42 a.m., is

5    prepared in full compliance with the current Transcript

6    Format for Judicial Proceedings and is a true and

7    accurate non-compressed transcript of the proceedings

8    as recorded.

9

10   Eileen M Zakrzewski /KC

     Eileen M. Zakrzewski, AOC NO. 529

11   G&L TRANSCRIPTION OF NJ

                              Date: August 18, 2014

12

13

14

15

16

17

18

19

20

21

22

23

24

25