# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY, NEWARK DIVISION

| | |
|---|---|
| ISRAEL ALBERT ALMEIDA and MICHAEL R. TUMMINELLI | ) ) |
| | ) Case No. 2:16-cv-03411-KM-JBC |
| Plaintiffs, | ) |
| | ) |
| v. | ) HEARING: AUGUST 1, 2016 |
| | ) |
| THE HON. N. PETER CONFORTI, et al. | ) ORAL ARGUMENT REQUESTED |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

Ryan S. Watson
Law Offices of J. Scott Watson, P.C.
24 Regency Plaza
Glen Mills, PA  19342
(610) 358-9600
NJ Bar No. 089642013
ryan.watson@jscottwatson.com

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS  39130
(601) 852-3440
stephen@sdslaw.us
MS Bar No. 102784
*Admitted Pro Hac Vice

Alan Alexander Beck
Law Office of Alan Beck
4780 Governor Drive
San Diego, CA  92122
(619) 905-9105
Alan.alexander.beck@gmail.com
*Admitted Pro Hac Vice

Dated: July 1st, 2016

<u>TABLE OF CONTENTS</u>

Table of Contents…………………………………………………..……………ii

Table of Authorities…………………………………………………………..iv

Introduction…………………………………………………………..…………1

Standard for Preliminary Injunction…………………………………………..1

Argument

I.      Plaintiffs Are Likely to Succeed On the Merits

    a.      Defendants Interpretation of the Justifiable Need Standard is Ultra
    Vires…………………………………………………………....……..……2

    b.      Defendants Construction Is Not Reasonable Because It Gives the
    Statute Greater Effect Than Is Permitted by the Statutory Language……...…4

    c.      Defendants' Interpretation is Plainly at Odds with the Statute…....…..5

    d.      Defendants Construction Violates Express and Implied Legislative
    Intent……………………………………………………………….……8

    e.      But for Defendants' Ultra Vires Construction, Plaintiffs Would Fulfill
    Justifiable Need………………………………………………………11

    f.       Defendants Application of New Jersey Law Violates Plaintiffs
    Second Amendment Rights…………………………………………..16

    g.      The Right to Keep and Bear Arms Extends Outside the Home……..18

    h.      Even if New Jersey's Laws Are Long Standing, Plaintiffs Can Rebut
    This Presumption………………………………………………….....25

    i.       Defendants Do Not Have an Important Interest in Prohibiting
    Plaintiffs from Carrying a Firearm Either Open or Concealed………………26

II.     Plaintiffs Will Continue to Suffer Irreparable Harm in the Absence of
Preliminary Relief………………………………………………………....28

III.    The Balance of Equities Tips in Plaintiffs' Favor………………...……..31

IV.     An Injunction Is in the Public Interest…………………………………..32

V.      The Court Should Enter Final Judgment for Plaintiffs……………...……..32

Conclusion…………………………………………………………………...35

Certificate of Service……………………………………………...…………36

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Abdul–Akbar v. McKelvie,* 239 F.3d 307 (3d Cir.2001) ...........................................7

*Am. Exp. Travel Related Services Co., Inc. v. Sidamon-Eristoff*, 755 F. Supp. 2d
556, 601 (D.N.J. 2010), *order clarified* (Jan. 14, 2011), *aff'd sub nom. Am. Exp.
Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359 (3d Cir. 2012),
and *aff'd sub nom. New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669
F.3d 374 (3d Cir. 2012) ........................................................................3

*Andrews v. State*, 50 Tenn. 165 (1871) ....................................................23

*Aymette v. State*, 1840 WL 1554 (Tenn. 1840)...........................................23

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989)...............................27

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) .................................................24

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) 29,
30

*Curtis 1000, Inc. v. Suess*, 24 F.3d 941 (7th Cir. 1994) .........................................33

*Davis v. District of Columbia*, 158 F.3d 1342 (D.C. Cir. 1998) ............................29

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................... passim

*Drake v. Filko,* 724 F.3d 426 (3d Cir. 2013), cert. denied, 134 S.Ct. 2134 (U.S.
2014) .................................................................................... 17, 26

*Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ...............7, 29

*Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) ...........................................30

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ..................................................29

*In re New York City Shoes, Inc.,* 880 F.2d 679 (3d Cir.1989)..................................7

*In re Preis*, 118 N.J. at 571 (N.J. 1990)...................................................................6

*In re Suspension of Teaching Certificate of Van Pelt,* 414 N.J.Super. 440, 446, 999

A.2d 481 (App.Div.2010) ....................................................................................3

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99 (3d Cir. 2013)......32

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) ...........................................16

*Moore v. Madigan,* 702 F.3d 933 (7th Cir. 2012) ........................................... 33, 34

*Morris v. District of Columbia*, 38 F. Supp. 3d 57 (D.D.C. 2014).........................33

*Nunn v. State,* 1 Ga. 243, 251 (1846)......................................................................23

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ......................................................27

*Reilly v. AAA Mid-A. Ins. Co. of New Jersey*, 946 A.2d 564 (N.J. 2008).................4

*Reilly v. State*, 59 N.J. 559 (1971) ...........................................................................6

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)..........................................................19

*S. California Gas Co. v. City of Santa Ana,* 336 F.3d 885 (9th Cir. 2003 .............27

*Siccardi v. State*, 284 A.2d 533 (N.J. 1971) ..................................................... 17, 25

*Sir John Knight's Case* 87 Eng. Rep. 75 K.B. (1686) ....................................... 18, 19

*State v. Chandler*, 5 La. Ann. 489 (1850)................................................................23

*State v. Reid*, 1 Ala. 612  (1840) ..................................................................... 22, 23

*Stop H-3 Ass'n v. Dole*, 870 F.2d 1419 (9th Cir. 1989) ...........................................27

*T.H. v. Div. of Developmental Disabilities,* 189 N.J. 478, 490, 916 A.2d 1025

   (2007) ........................................................................................................3

*Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994) .....................................................27

*U.S. v. Barton*, 633 F.3d 168 (3d Cir. 2011) ..................................................... 25, 26

*U.S. v. Chester,* 628 F.3d 673 (4th Cir. 2010) .........................................................27

*U.S. v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame,*

   *Unknown Caliber Serial No. LW001804*, 14-CV-06569, 2016 WL 2893670 (3d

   Cir. May 18, 2016) ..................................................................................7

*Winter v. Natural Res. Def.  Council, Inc*., 55 U.S. 7 (2008) ....................................1

*Winter v. NRDC*, 555 U.S. 7 (2008) ............................................................... 28, 29

## Statutes

18 U.S.C. § 922(o) ....................................................................................7

N.J. Stat. § 2C:58-4 ........................................................................... passim

N.J. Stat. § 2C:58-4(c)-(d) ....................................................... 2, 8, 15, 16

## Other Authorities

1876 Wyo. Comp. Laws ch. 52, § 1.....................................................................22

4 William Case:  Blackstone, *Commentaries On The Laws Of England* 148 (1769)

   ......................................................................................................19

5 N.Y. Colonial Laws, ch. 1501at 244–46 (1894) ....................................................21

Act of Aug. 26, 1721, ch. 245, Acts of Pennsylvania 157–58................................21

Act of May 28, 1746, ch. 10, 1778 Mass. Sess. Laws, ch.5, 193, 194 ...................21

Alexander Hamilton, The Federalist No. 28 (1787) ...............................................21

Black's Law Dictionary (10th ed. 2014) ..................................................................4

Compiled Statutes of New Jersey, Vol. II., 1759 (Soney & Sage 1911)................25

David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*,

    4 DETC.L.REV 789, 795 (1982) ......................................................................19

English Bill of Rights (1689) ..................................................................................20

Joyce Lee Malcolm, *To Keep And Bear Arms The Origins of An Anglo-American*

    *Right* 104-05 (1994) ............................................................................................20

Patrick J. Charles, *The Second Amendment: The Intent and Its Interpretation by the*

    *States and the Supreme Court*, 77 (2009) ........................................................22

Stephen P. Halbrook, *That Every Man Be Armed*: *The Evolution of a*

    *Constitutional Right* 55 (1984) ........................................................................21

**Rules**

FED. R. CIV. P. 65(a)(2) ........................................................................................32

**Treatises**

1 William Oldnall Russell, *A Treatise On Crimes And Indictable Misdemeanors* 271 (1826) ..........................................................................................20

William Hawkins, 1 *Treatise Of The Pleas Of The Crown,* ch. 63, § 9 (1716) ......20

**Regulations**

N.J. Admin. Code § 13:54-2.4 ......................................................... 2, 4, 5

<u>Introduction</u>

Plaintiffs bring this preliminary injunction in order to be issued carry permits to carry either openly or concealed for the pendency of this litigation.  Both Plaintiffs currently face immediate threats to their life that cannot be reasonably avoided. Being armed for confrontation is their only reasonable option to preserve their lives. Despite their demonstrated justifiable need, Defendants refuse to issue them a license to carry a firearm.  This is in direct contradiction to the legislative intent behind the justifiable need standard and this interpretation violates Plaintiffs' Second Amendment rights. For the reasons described below, Plaintiffs respectfully request this Court enjoin the Defendants' application of justifiable need as applied against Plaintiffs for the pendency of litigation and order the appropriate Defendants to issue permits to carry either openly or concealed to Plaintiffs.

**<u>Argument</u>**

<u>Standard for Preliminary Injunction</u>

In order to obtain preliminary injunctive relief, Plaintiffs must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def.  Council, Inc.*, 55 U.S. 7, 19 (2008).

## I.    <u>Plaintiffs Are Likely to Succeed On the Merits</u>

a.   <u>Defendants Interpretation of the Justifiable Need Standard is Ultra Vires</u>

Presently, the New Jersey state law requires applicants for a handgun permit to carry to show "justifiable need" in order to be approved for a permit.  Within the statute, the term justifiable need is never defined.    N.J. Stat. § 2C:58-4(c)-(d), as implemented by N.J. Admin. Code § 13-54-2.4(d)(1), conditions the approval and issuance of a Permit to Carry on the existence of "justifiable need," which is defined as an "urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun."

Implementation of a statute is ultra vires if it contradicts the statute's plain language. See *Shalom Pentecostal Church v. Acting Sec'y, United States Dep't of Homeland Sec.*, 783 F.3d 156 (3d Cir. N.J. 2015). Before the Court is a New Jersey state law, which is bound to apply the New Jersey Supreme Court's method of statutory construction.

> Under New Jersey law, the Treasury Department's interpretation of New Jersey's escheat statute is entitled to deference. *Clymer,* 171 N.J. at 67, 792 A.2d 396. Where, as here, there is an "absence of case law" interpreting a precise issue under a statute, "the Treasurer's construction of the statute takes on added significance." *Id.* Thus, in construing the escheat statute, New Jersey courts are directed to "give[ ] appropriate weight" to the Treasurer's interpretation. *Id.* This is not to say that any interpretation by the Treasurer will suffice; rather, the Treasurer's interpretation must be "consistent with the Legislature's intent in

enacting the statute, consonant with the State's strong public policy favoring custodial escheat, and reflective of a sensible reading of the statute itself." *Id.*

Simply put, the Treasurer's interpretation of the statute must be reasonable. *See In re Suspension of Teaching Certificate of Van Pelt,* 414 N.J.Super. 440, 446, 999 A.2d 481 (App.Div.2010) ("[B]eing a strictly legal issue, a ... court is not bound by an agency's construction of a statute, and an agency's determination will be reversed where it is plainly unreasonable.") (quoting *T.H. v. Div. of Developmental Disabilities,* 189 N.J. 478, 490, 916 A.2d 1025 (2007)) (internal quotation marks omitted). According to the New Jersey Supreme Court, there are several circumstances in which an administrative interpretation will be deemed unreasonable, where the interpretation: (a) gives a statute "greater effect than is permitted by the statutory language;" (b) is "plainly at odds with the statute,"; (c) "violates express and implied legislative intent." *T.H.,* 189 N.J. at 490–91, 916 A.2d 1025. To ascertain whether an agency interpretation avoids these legislative landmines, then, a court must first determine the meaning of the enabling statute.

*Am. Exp. Travel Related Services Co., Inc. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 601 (D.N.J. 2010), *order clarified* (Jan. 14, 2011), *aff'd sub nom. Am. Exp. Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359 (3d Cir. 2012), and *aff'd sub nom. New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374 (3d Cir. 2012).

Thus the matter before this Court is whether Defendants interpretation of N.J. Stat. § 2C:58-4's justifiable need standard is reasonable.

b.  <u>Defendants Construction Is Not Reasonable Because It Gives the Statute Greater Effect Than Is Permitted by the Statutory Language</u>

The New Jersey Supreme Court has "… cautioned that if an agency's statutory interpretation is contrary to the statutory language, or if the agency's interpretation undermines the Legislature's intent, no deference is required." *Reilly v. AAA Mid-A. Ins. Co. of New Jersey*, 946 A.2d 564, 571 (N.J. 2008) (citations and internal punctuation omitted).

First, we turn to the phrase at issue: justifiable need. *Justifiable* is defined as "[l]egally or morally acceptable for one or more good reasons; excusable; defensible." *Justifiable*, <u>Black's Law Dictionary</u> (10th ed. 2014). *Need* is defined as follows: "1. The lack of something important; a requirement. 2. Indigence. 3. An opportunity or condition for growth or other positive change." *Need*, <u>Black's Law Dictionary</u> (10th ed. 2014).  Compiling these definitions, one is left with the following: a requirement that is legally or morally acceptable for one or more good reasons. This is simply a heightened requirement implemented for New Jersey citizens to be granted a permit to carry either openly or concealed.

However, instead of implementing the statute as written, with defined terminology that simply fits within the statute at issue, the N.J. Admin. Code requires a heightened need. This need is beyond the plain meaning of justifiable need and therefore renders the statute it purports to implement unobtainable by New Jersey citizens with a legitimate need to carry a firearm.

c.  <u>Defendants' Interpretation is Plainly at Odds with the Statute</u>

Defendants' interpretation of the justifiable need standard is plainly at odds with the statute because no one can fulfill Defendants' standard. N.J. Admin. Code § 13:54-2.4(d) adds the requirement, not included in the statute regarding permitting, that justifiable need means "specific threats or previous attacks which demonstrate a special danger to the *applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun*." (emphasis added).  N.J. Admin. Code § 13:54-2.4(f) further states:

> (f) An application for a permit to carry a handgun shall be prioritized and be investigated on an expedited basis and approved or disapproved without undue delay, within 14 days if possible, under the following circumstances:
>
> 1. The applicant is a private citizen who applies for a permit to purchase a handgun and/or a firearm purchaser identification card contemporaneously with the application for a permit to carry a handgun or who has previously obtained a handgun purchase permit from the same licensing authority; and
>
> i. Has been the victim of an act of violence that resulted in the infliction of serious or significant bodily injury, or was credibly threatened with an act of violence that if carried out would result in the infliction of serious or significant bodily injury, or subjected to an incident in which the actor was armed with and used a deadly weapon or threatened by word or gesture to use a deadly weapon as defined in N.J.S.A. 2C:11-1.c against the applicant, and there is a substantial likelihood, based on the information presented in the applicant's State of New Jersey Request for Expedited Firearms Application form (S.P. 398), and any other information revealed in the investigation of the application, that the applicant will in the foreseeable future be subjected to another such incident; …

2. An applicant who meets the criteria in (f)1 i or ii above shall be deemed to have demonstrated justifiable need (as set forth in N.J.A.C. 13:54-2.3(a)(3)[.]

(a) gives a statute "greater effect than is permitted by the statutory language;" (b) is "plainly at odds with the statute,"; (c) "violates express and implied legislative intent."

By inserting the "specific threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other means" element into the statute, Defendants inserted a requirement that the legislature did not intend. In the case of a private citizen, such as Almeida, a permit to carry a handgun may "be issued only to those who can establish an urgent necessity for protection of self or others as for example, in the case of one whose life is in danger as evidenced by serious threats or earlier attacks." *In re Preis*, 118 N.J. at 571, 574 (N.J. 1990); see also N.J.A.C. 13:54–2.4(d)(1). "The requirement is of specific threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other means." *Preis, supra*, 118 N.J. at 571 (citing *Reilly v. State*, 59 N.J. 559, 562 (1971). As the trial court that reviewed Mr. Almeida's permit application explained if "there are other means he can employ" to conduct one's business then this means there are "other means" and a person is not qualified to carry a firearm. *See* Exhibit "7", Tr. ¶ 36:21-36:22, June 18, 2014.  From that court's perspective, a person should be required to first attempt to either change jobs or change the way one conducts business without regard to the feasibility of said actions.

Literally construed, a person must be unable to move, change jobs or hire private security in order to be issued a permit to carry a firearm under this standard.. This is untenable because the exception swallows the rule. Theoretically, anyone, if properly motivated and financially able, could simply move out of the state of New Jersey. Under the same line of thinking, no person could then fulfill this standard. The Third Circuit recently dealt with a legal theory that argued 18 U.S.C. § 922(o) did not apply to a machinegun held in a trust because it only applies to "persons" and a trust is not a "person" under the statute's definition. There the Third Circuit found that this could not be this case:

> …because to interpret the Gun Control Act as Watson suggests would allow any party—including convicted felons, who are expressly prohibited from possessing firearms under 18 U.S.C. § 922(g)(1)—to avoid liability under this section simply by placing a machine gun "in trust." Any "individual, company, association, firm, partnership, society, or joint stock company" could lawfully possess a machine gun using this method. 18 U.S.C. § 921(a)(1). Interpreting the statute so as to include this exception would thereby swallow the rule. We refuse to conclude that with one hand Congress intended to enact a statutory rule that would restrict the transfer or possession of certain firearms, but with the other hand it created an exception that would destroy that very rule. *See Abdul–Akbar v. McKelvie,* 239 F.3d 307, 315 (3d Cir.2001) (rejecting an interpretation of a statute that would allow the exception to swallow the rule); *In re New York City Shoes, Inc.,* 880 F.2d 679, 685 n. 6 (3d Cir.1989) (same); *see also Elrod v. Burns,* 427 U.S. 347, 359 n. 13, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (same).

*U.S. v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 14-CV-06569, 2016 WL 2893670, at *3 (3d Cir. May 18, 2016).

7

Here, Defendants interpretation is also necessarily without merit because it renders N.J. Stat. § 2C:58-4(c)-(d) meaningless by narrowing the standard for justifiable need to a standard that is impossible to obtain. Any person can move away from their home if needed, any person could abandon his or her job if absolutely necessary, even though that person may have to expend hundreds of thousands in the process. As constructed by Defendants, the justifiable need standard cannot be met unless it is *absolutely impossible* to avoid one's stalker or fall victim to an attack. This is an ultra vires construction.  Further, taken to the New Jersey Court's absurd conclusion, anyone that was previously attacked and granted a permit to carry could simply change jobs or move and thus be outside of the justifiable need standard as applied by Defendants.

 If the New Jersey legislature had wanted this to be the standard by which handgun carry permits were issued, then it would not have used the wording justifiable need.  Rather, it would have made carry completely illegal in any scenario. But it did not as Attorney General Sills explained in his testimony, *infra*. Here, Defendants interpretation of the justifiable need standard is plainly at odds with the statute and is an impermissible ultra vires action.

   d.  Defendants' Construction Violates Express and Implied Legislative
       Intent
Defendants require an applicant to show specific threats in order to fulfill the justifiable need standard.  This construction violates the legislative intent behind the

justifiable need statute because it disqualifies a large segment of individuals that meet justifiable need from qualification.  Persons who experience serious threats to their life, yet have not received a specific threat, cannot qualify for a carry permit despite clearly having a heightened need but no less justifiable need than a person who has experienced specific threats.

At the time the need standard was ratified in 1924, the legislature contemplated that all persons that could demonstrate a need to carry should be allowed to carry. In 1979, the law was amended to add "justifiable" to the need requirement, giving us the current state of justifiable need.  Defendants disallow an entire class of persons, i.e. those that can demonstrate a serious threat to their lives but not specific threats, from carrying a firearm for self-defense.   Therefore, Defendants construction is ultra vires because it goes against the legislature's intent when it drafted the justifiable need standard.

Legislative history during the debate of Assembly Bill No. 165 [re Regulation of Sale and Purchase of Firearms] demonstrate that the Assembly did not intend for the Defendants to arbitrarily deny permits to carry firearms.  The Public Safety Director, Dominic Spina ("Spina"), spoke in support of the bill.  Spina testified that:

> … there are a lot of good things about this bill.  For example, for the first time it clarifies many inconsistencies.  Heretofore a chief of police could arbitrarily refuse to issue a permit to purchase or a permit to carry a concealed weapon and I have seen some very bad cases where chiefs of police have turned down these permits.  You know a lot of chiefs of police are afraid to issue these permits because if a homicide does occur

as a result of this man or this woman having a gun which happened through a permit to purchase, he feels that the onus is upon him and that he would be at fault.  This bill clarifies this.

Exhibit "A," p. 52-53.

New Jersey Attorney General Arthur J. Sills stated, in support of the bill, that:

"… standards are set forth to determine if the issuance of a permit to a person to purchase or carry or a pistol or revolver would be in the interest of public health, safety or welfare.  For those who wish to carry a pistol or revolver, permits will be required as they are under present law.  For those who desire to purchase rifles or shotguns, they will have to obtain a firearms purchaser identification card.  This card would be obtained once in a lifetime and its holder would be able to purchase and carry as many rifles and shotguns as he owns or desires to own."

*Id*. at 5.  AG Sills further testified, that "[i]t is our feeling that any man who can pass the State Police, as he does today … and be fingerprinted and be licensed as a private detective would have no difficulty himself in getting a permit to purchase or to carry…"  *Id*. at 67A.

James E. Anderson, an attorney speaking on his own behalf, stated: "… this act now makes it an offense to possess an unconcealed weapon – hand gun at the very least- without a permit to carry, whereas heretofore you could walk down Broad Street in Paterson with a pistol on each hip and you were immune because the weapon was not concealed…"  *Id*. at 79A.  Further, Mr. Anderson stated that "… the provisions for issuance of a permit to carry a concealed weapon that some standard should be established.  The only provision, as this bill handles the situation

– it says that the judge must be satisfied of many things, including the need of the applicant to carry a pistol or revolver." *Id.*

There is no question that the legislative history and statutes comport with the fact that individuals that possess a need to carry a firearm would be given that permit to carry.  In Plaintiffs' case, a permit to carry would allow them to carry openly or concealed, because as Mr. Anderson pointed out in his testimony, the new bill now regulated the open or unconcealed carry of a firearm.

e. But for Defendants' Ultra Vires Construction, Plaintiffs Would Fulfill Justifiable Need

Both Plaintiffs in this matter have specific threats which threaten their lives. Both have applied for carry permits and have been denied solely due to Defendants ultra vires construction of N.J. Stat. § 2C:58-4.  Mr. Almeida has suffered a litany of threats and attacks during his time as a property manager that clearly constitute specific threats.  However, Defendants maintain that since "there are other means he can employ" to conduct his business these threats can be avoided. *See* Exhibit "7", Tr. ¶ 36:21-36:22, June 18, 2014.

In 2010, Almeida retired from the public safety line of work and opened a firm involving Property Management services in the Newark and surrounding urban areas of New Jersey. Compl. ¶ 44.  Almeida's job responsibilities include rental of property, evicting tenants for various reasons, including non-payment of rent and illegal activities. Compl. ¶ 45. Almeida also performs rent collections, mostly after-

hours and in areas where the property is located, oftentimes in areas well known for gang activity, drug sales and illegal weapons use.  Compl. ¶ 46. Almeida is a clear target and his life is in danger due to having to perform his job responsibilities, including rent collection and evictions of tenants. Compl. ¶ 47. Almeida is also a clear target due to carrying large sums of cash which is unavoidable due to tenants not being able to pay rent via check or other non-cash equivalent. Compl. ¶ 48. Almeida sometimes must also confront the perpetrators of illegal activities at the properties he manages as his tenants' desire to live in areas that do not allow crime to run unabated. Compl. ¶ 49.

In June of 2013, Almeida was forced to evict a tenant for nonpayment. This tenant was a career criminal that served prison time for aggravated assault and he was also known as a "Money, Murder, Sex" bloods gang member. Compl. ¶ 50. This subject took offense that Almeida evicted him and his family, so he threatened Almeida's life in various ways and on several occasions. including telling Almeida that "as long as [Almeida is] in New Jersey, [Almeida is] no longer safe, no matter how long it takes for him or his crew to kill [Almeida]." The subject told Almeida that he will have Almeida robbed and shot and dump his body on a dead end street to make it look like a robbery Compl. ¶ 51. Almeida filed a terroristic threat police report which did nothing.  *See* Exhibit "3".  The subject then stated he would shoot the police if they came for him. Compl. ¶ 52. Around this time, Almeida was also

the subject of an attempted carjacking incident. Compl. ¶ 53. Shortly after these incidents, Almeida applied for a New Jersey Handgun Permit with the local police and included the attached letter. *See* Exhibit "4". This application was denied on October 24, 2013. *See* Exhibit "5".

Since Almeida's appeal was denied, Almeida has suffered numerous other credible threats of violence against his person, including death.[1] Compl. ¶ 69. On December 21, 2015, Almeida was the subject of an attempted armed robbery outside of a property he managed. Compl. ¶ 70. In December 2015, Almeida's life was threatened by gang members due to Almeida clearing them from a managed property. Compl. ¶ 71. On January 6, 2016, a man pointed a gun to Almeida's face and told him that that next time he will shoot Almeida in the face. Compl. ¶ 72. On or about April 22, 2016, a property Almeida manages was vandalized with graffiti and Almeida advised that if he continued to call the police on the drug dealers and putting up security systems on properties, they would come back to "take [Almeida] out shooting" and burn the building down with Almeida in it, because Almeida was costing them money Compl. ¶ 73. On or about May 2, 2016, one of Almeida's properties had a window shot out Compl. ¶ 74. On or about May 3, 2016, one of Almeida's properties was tagged with graffiti, including the words "snitches get

---

[1] In the past few days, Almeida has been the subject of additional threats upon his life. Almeida has not received the police reports as of the date of this filing, but will supplement those into the record as soon as he receives them.

stiches" and the number "252" which is a locally known gang.  It is believed that this number is used when the gang is about to commit a shooting on its intended target.  Almeida's name was also mentioned in the graffiti.  Compl. ¶ 75.

Mr. Michael Tumminelli currently faces threats on two fronts.  Currently Mr. Tumminelli's position is to instruct military units on new and emerging technologies to include operational reviews and tactics, techniques and procedures involving intimate knowledge of how US Military systems function in their rightful capacities. Compl. ¶ 85. Mr. Tumminelli is responsible for coordinating with all levels of National and Theater Level Commands, Theater Special Operations Command (TSOCs), Special Operations Forces (SOF) component commands to remain attributed to changes in policies and missions that support National policies.

Additionally, he acts to initiate actions to ensure implementation of new special programs are integrated in the organizations. These positions require Top Secret and compartmentalized caveat clearances that allow for highly sensitive information to be retained. Compl. ¶ 88. Mr. Tumminelli is responsible for safe-keeping highly classified documents which make him a target. He regularly travels with classified information upon his person.  This makes him a target for robbery and espionage.

Furthermore,  as early as October 9, 2014, established  threat  assessments made by the Federal Bureau of Investigations (FBI), Department of Homeland

Security (DHS), Department  of Defense (DoD) along with  the New Jersey
Intelligence  Data Fusion Center (NJSPIFC) located in West Trenton,  New Jersey,
have amassed numerous  threat  assessments and intelligence  reports (classified and
unclassified) that have identified that ISIS have posed direct threats to US Military
and  Civilian  Government  personnel  as  well  as  identified  US  Military  and
Intelligence  veterans. Unclassified reports and bulletins that are limited in subject
but identify violent acts to be committed against said personnel, due to the sensitivity
of collection methods, have identified a significant threat to all personnel and family
members related to external National Security protocols and employment related
identities.

Here, Mr. Tumminelli has a clearly demonstrated special danger against
himself.  Most days of the week he carries classified information that is of high value
to America's enemies.  He himself is a high value target to our enemies.  But for
Defendants ultra vires construction of the justifiable need standard, Mr. Tumminelli
would qualify for a handgun carry permit under New Jersey State Law.

Both Plaintiffs are the trained law abiding citizens with justifiable need that
the New Jersey legislature contemplated be issued handgun carry permits when it
enacted N.J. Stat. § 2C:58-4(c)-(d), Despite that, Defendants have impermissibly
interpreted its own laws in a manner that make is impossible for these two law-
abiding Americans to obtain the carry permits they need to defend their lives.

Defendants' conduct is ultra vires. Even if it were not, Defendants violate Plaintiffs Second Amendment rights via their application of N.J. Stat. § 2C:58-4(c)-(d) and Plaintiffs should be granted relief on those grounds.

      f.   <u>Defendants Application of New Jersey Law Violates Plaintiffs Second Amendment Rights</u>

Eight years ago, the United States Supreme Court issued the landmark decision styled *District of Columbia v. Heller*, 554 U.S. 570 (2008). In that case, the Court held that "ban[s] on handgun possession in the home violate the Second Amendment as does [a] prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Heller*, 554 U.S. at 635. Further, the *Heller* Court clearly intended that the fundamental right to bear arms extend beyond the threshold of the front door. There is no dispute that states may regulate the right in any number of ways not relevant here. But there is also no disputing the fact that the *Heller* Court additionally held that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* at 584 (citations omitted). And, that the protected purposes necessitating the right, secured by the Second Amendment and identified by *Heller*, cannot be accomplished within the confines of the home. Two years after *Heller,* in *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the Supreme Court held that the right to keep and bear arms was a fundamental right, made applicable to the states through the Fourteenth Amendment.

Three years later this Circuit was confronted with a facial challenge to New Jersey's carry law in *Drake v. Filko,* 724 F.3d 426 (3d Cir. 2013), cert. denied, 134 S.Ct. 2134 (U.S. 2014).  There, the Third Circuit found that:

> Here, we conclude that the requirement that applicants demonstrate a "justifiable need" to publicly carry a handgun for self-defense qualifies as a "presumptively lawful," "longstanding" regulation and therefore does not burden conduct within the scope of the Second Amendment's guarantee. Accordingly, we need not move to the second step of *Marzzarella*. Nevertheless, because of the important constitutional issues presented, we believe it to be beneficial and appropriate to consider whether the "justifiable need" standard withstands the applicable intermediate level of scrutiny. We conclude that even if the "justifiable need" standard did not qualify as a "presumptively lawful," "longstanding" regulation, at step two of *Marzzarella* it would withstand intermediate scrutiny, providing a second, independent basis for concluding that the standard is constitutional…. The "justifiable need" standard Appellants challenge has existed in New Jersey in some form for nearly 90 years. *See Siccardi v. State*, 284 A.2d 533, 538 (N.J. 1971). Beginning in 1924 New Jersey "directed that no persons (other than those specifically exempted such as police officers and the like) shall carry [concealed] handguns except pursuant to permits issuable only on a showing of 'need.'" *Id.* (internal citations omitted). In 1966, New Jersey amended its laws to prohibit individuals from carrying handguns in public, in any manner, without first obtaining a permit, and again conditioned the issuance of such permits on a showing of need. The predecessor to the Handgun Permit Law subsequently underwent multiple revisions, the requirement of "need" enduring each, and ultimately the present-day standard of "justifiable need" became statutorily enshrined in 1978.

Here, Plaintiffs challenge Defendants' application of the justifiable need standard rather than the justifiable need itself.  The administrative code's specific threats requirement was brought into effect in 1978.  Based upon Supreme Court precedent

this cannot be a longstanding regulation because the Washington D.C. statute at issue in *Heller* was passed in 1975.  *See Heller* 554 U.S. at 582.  Further the *Drake* Court assumed that the right applied outside the home but did not confirm that fact. This Court should explicitly find it does because the Second Amendment right, as proved through the text, history, and tradition of the Second Amendment, demonstrates that it does.

     g.  <u>The Right to Keep and Bear Arms Extends Outside the Home</u>

Historically, citizens enjoyed the right to bear arms.  According to the *Heller* Court, the Second Amendment codified a pre-existing right to bear arms.  *Id*. at 599. Accordingly, if it can be demonstrated there was a historical right to bear arms at Common Law, then there is one the modern era.   While the *Heller* Court discussed this issue at length, *Heller*, 554 U.S. at 584 ("in numerous instances from a review of "founding-era sources", 'bear arms' was unambiguously used to refer to the carrying of weapons outside of an organized militia"); within the Common Law, the earliest written code which asserted the right to bear arms is the Statute of Northampton of 1328. While it did place some minor restrictions on the carrying of arms with evil intent, "the common law principle of allowing 'Gentlemen to ride armed for their Security'" was preserved.

In *Sir John Knight's Case* 87 Eng. Rep. 75 K.B. (1686):

     An information was exhibited against him by the Attorney General,
     upon the statute of 2 Edw. 3, c. 3, which prohibits "all persons from

coming with force and arms before the King's Justices, &c., and from going or riding armed in affray of peace, on pain to forfeit his armour, and suffer imprisonment at the King's pleasure." This statute is confirmed by that of 20 Rich. 2, c. 1, with an addition of a further punishment, which is to make a fine to the King.

The information sets forth, that the defendant did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects, *contra formam statuti*.

This case was tried at the Bar, and the defendant was acquitted. The Chief Justice said, that the meaning of the statute of 2 Edw. 3, c. 3, was to punish people who go armed to terrify the King's subjects. It is likewise a great offence at the common law, as if the King were not able or willing to protect his subjects; and therefore this Act is but an affirmance of that law; and it having appointed a penalty, this Court can inflict no other punishment than what is therein directed.

*See Sir John Knight's Case* 87 Eng. Rep. 75 K.B. (1686). David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, 4 DETC.L.REV 789, 795 (1982) (*citing Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)); 4 William Case: Blackstone, *Commentaries On The Laws Of England* 148 (1769) ("the offence of riding or going armed, with *dangerous or unusual weapons*, is a crime against the public peace, *by terrifying the good people of the land*") (emphases added).

The peaceable bearing of commonly used arms was protected:

[N]o wearing of Arms is within the meaning of this Statute, unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against this statute by wearing common weapons . . . for their ornament or defence, in such places, and upon such occasions, in which it is the common fashion to make use of them, without ca disturbance of the peace.

William Hawkins, 1 *Treatise Of The Pleas Of The Crown,* ch. 63, § 9 (1716); *see*
Joyce Lee Malcolm, *To Keep And Bear Arms The Origins of An Anglo-American*
*Right* 104-05 (1994).

> [T]here may be an affray . . . where persons arm themselves with
> dangerous and unusual weapons, in such manner as will naturally cause
> a terror to the people.
>
> * * * *
>
> But it has been holden, that no wearing of arms, is within meaning of
> Statute of Northampton, unless it be accompanied with such
> circumstances as are apt to terrify the people; from whence it seems
> clearly to follow, that persons of quality are in no danger of offending
> against the statute by wearing common weapons . . . in such places, and
> upon such occasions, in which it is the common fashion to make use of
> them, without causing the least suspicion of an intention to commit any
> act of violence, or disturbance of the peace.

1 William Oldnall Russell, *A Treatise On Crimes And Indictable Misdemeanors* 271
(1826).  Later on, the English Bill of Rights of 1689 specifically guaranteed "no
royal interference in the freedom of the people to have arms for their own defence
as suitable to their class and as allowed by law." Indeed, the same document
describes the injustices committed by King James II, resulting in the ratification of
that Bill of Rights, including that he had "caused several good subjects being
Protestants to be disarmed at the same time when papists were both armed and
employed contrary to law." English Bill of Rights (1689). Thus, the document
restored rights to Protestants that were abrogated by King James II. *Id.*

The historical record of the United States at the time of the Second Amendment's ratification shows the right to carry arms outside the home increased. Revolutionary War-era Americans, heavily influenced by the tyranny of the British in adopting the Bill of Rights "held the individual right to have and use arms against tyranny to be fundamental." Stephen P. Halbrook, *That Every Man Be Armed*: *The Evolution of a Constitutional Right* 55 (1984). Similarly, the Federalist papers also speak of the right to bear arms. Alexander Hamilton wrote "[when] representatives of the people betray their constituents, there is then no resource left but in the exertion of that original right of self-defense, which is paramount to all positive forms of government." Alexander Hamilton, The Federalist No. 28 (1787).

While those historical references speak most acutely to the right in defending against a tyrannical government, they also recognize an inherent right to have arms for other purposes. Halbrook, *supra*. at 69, n. 141 ("[T]he right to have weapons for nonpolitical purposes, such as . . . hunting . . . appeared so obvious to be the heritage of free people as never to be questioned."). Furthermore, while several urban municipalities restricted the discharge of firearms within the city bounds or during certain days, (*See* Act of May 28, 1746, ch. 10, 1778 Mass. Sess. Laws, ch.5, 193, 194; 5 N.Y. Colonial Laws, ch. 1501at 244–46 (1894); Act of Aug. 26, 1721, ch. 245, Acts of Pennsylvania 157–58), no early American law entirely prohibited the ownership, possession, or use of firearms for self-defense, hunting, or recreation.

Patrick J. Charles, *The Second Amendment: The Intent and Its Interpretation by the States and the Supreme Court*, 77 (2009). Accordingly, at the time of the Second Amendment's ratification there was an understood and unquestioned right to carry arms outside the home.

Even the most restrictive laws at the time of the ratification of the 14th Amendment acknowledged a clear right to carry outside the home either concealed or openly (1876 Wyo. Comp. Laws ch. 52, § 1 (forbidding '*ope[n]* bearing . . .') (1894); 1871, ch. 34 (prohibiting . . . except, in part,  for militia service); *accord Aymette v. State*, 1840 WL 1554, *4 (Tenn. 1840) ("The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, *and which are not usual in civilized warfare, or would not contribute to the common defence*.") (emphases added)).   Notably, the *Aymette* Court's interpretation of the Second Amendment was specifically rejected in *Heller*. *Heller*, U.S. 554 at 613 (noting that the court concluded that concealed carry could be prohibited where open carry was permitted).  In *Reid*, which upheld a ban on the carrying of concealed weapons, Alabama's high court explained:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional.

*State v. Reid*, 1 Ala. 612, 616-17 (1840). The *Nunn* Court followed *Reid*, and quashed

an indictment for publicly carrying a pistol where the indictment failed to specify

how the weapon was carried. *Nunn v. State,* 1 Ga. 243, 251 (1846). Likewise, in

*State v. Chandler*, 5 La. Ann. 489, 490 (1850), the Louisiana Supreme Court held

that citizens had a right to carry arms openly:

> This is the right guaranteed by the Constitution of the United States,
> and which is calculated to incite men to a manly and noble defence of
> themselves, if necessary, and of their country, without any tendency to
> secret advantages and unmanly assassinations. The act only . . . seeks
> to suppress the practice of carrying certain weapons secretly, that it is
> valid, inasmuch as it does not deprive the citizen of his natural right of
> self-defense, or of his constitutional right to keep and bear arms. But
> that so much of it, as contains a prohibition against bearing arms
> openly, is in conflict with the Constitution, and void.

*Id*. at 251. *Heller*, 554 U.S. at 613 (citing *Chandler*, supra.).

"The Tennessee Supreme Court recognized . . . 'this right was intended ... and

was guaranteed to, and to be exercised and enjoyed by the citizen as such, and not

by him as a soldier, or in defense solely of his political rights.'" *Id*. at 608 (quoting

*Andrews v. State*, 50 Tenn. 165, 183 (1871)).  Plaintiffs observe that the *Heller* Court

has already undertaken an appropriate historical analysis, specifically addressing the

right to *bear* arms as opposed to *keep*.  The Court concluded that "[a]t the time of

the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 570, 584

(citations omitted). Surveying the history of concealed carry prohibitions, courts

consistently upheld mere regulations of the manner in which arms are carried – with

understanding that a complete ban on the carrying of handguns is unconstitutional. In sum, a fair and complete historical analysis, such as that conducted in *Heller*, *supra*, supports a right to bear arms outside the home existed pre-*Heller*. The law is definite: the state may reasonably regulate the carrying of arms but cannot completely abrogate the right established by the plain language of the Second Amendment.  There is an overwhelming weight of tradition and precedent that confirm Americans' enjoyment of the fundamental right to bear arms.

But one can look to a recent case from the United States Supreme Court for the proposition that the right extends outside the home.   In *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016), Jaime Caetano carried a stun gun to defend herself, outside of her home, and was charged accordingly.  The Supreme Court overturned the ruling of the Supreme Judicial Court of Massachusetts and remanded for further proceedings because the "explanation the Massachusetts court offered for upholding the law contradicts this Court's precedent." *Id*. at 1028.  If there was not a right to self-defense outside the home, the Supreme Court could have simply upheld Caetano's conviction on the grounds that the Second Amendment did not protect her right to keep and bear arms for self-defense outside the home.  However, the Supreme Court rendered no such decision.  Justice Alito in his concurring opinion, stated succinctly: "If the fundamental right of self-defense does not protect Caetano, then the safety of all Americans is left to the mercy of state authorities who

may be more concerned about disarming the people than about keeping them safe."

*Id*. at 1032.

h. <u>Even if New Jersey's Laws Are Long Standing, Plaintiffs Can Rebut This Presumption</u>

In *U.S. v. Barton*, 633 F.3d 168 (3d Cir. 2011), this Circuit developed a test

for as-applied challenges. For these types of cases, this Court uses the following test:

> To raise a successful as-applied challenge, [an individual] must present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections. For instance, a felon convicted of a minor, non-violent crime might show that he is no more dangerous than a typical law-abiding citizen. Similarly, a court might find that a felon whose crime of conviction is decades-old poses no continuing threat to society.

*Barton*, 633 F.3d at 174.  By analogy, if Plaintiffs can present facts about themselves

that distinguish their circumstances from those of persons historically barred from

carrying firearms then they can raise a successful as-applied challenge. New Jersey

has long required that persons that carry demonstrate some form of need. *See*

*Siccardi v. State*, 284 A.2d 533, 538 (N.J. 1971) ("As early as 1882 [the Legislature]

prohibited the carrying of guns by young persons and almost a half a century ago it

directed that no persons . . . shall carry handguns except pursuant to permits issuable

only on a showing of need."). However, this required a simple generalized showing

of justifiable need rather than specific threats that could readily be avoided.

"In 1905, New Jersey enacted a statute providing for criminal punishment of the concealed carrying of 'any revolver, pistol, [or] firearm,' but allowed an exception for those with permits. Compiled Statutes of New Jersey, Vol. II., 1759 (Soney & Sage 1911). It does not appear, however, that the law contained any standards for issuance of such permits." *See Drake v. Filko*, 724 F.3d 426, 440 (3d Cir. 2013) Fn. 8.

Thus, historically those that were denied to the right to carry in New Jersey where only those that could not demonstrate a heightened need to carry a firearm. There was no requirement that one must demonstrate specific threats that could not be avoided by any means. Individuals, such as Plaintiffs who had a reason to carry a firearm were allowed. Plaintiffs have both established they are qualified to carry and have a justifiable need. Thus, in accordance with *Barton,* they have established facts about themselves that demonstrate they are within the scope of the Second Amendment right to carry. As applied to them, the government does not have an important governmental interest in denying them a permit to carry.

     i.   <u>Defendants Do Not Have An Important Interest in Prohibiting Plaintiffs From Carrying a Firearm Either Open or Concealed</u>

Plaintiffs concede that *Drake* is binding on this Court. Per *Drake,* this Court must apply the intermediate scrutiny standard to Plaintiffs challenge assuming it finds the Second Amendment right applies outside the home. However, even under this

standard, the Defendants has the ultimate burden of proving its policy satisfies whatever level of heightened scrutiny applies. *See, e.g., U.S. v. Chester,* 628 F.3d 673, 680 (4th Cir. 2010) ("unless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law").

Moreover, under heightened scrutiny, the presumption of validity is reversed, with the challenged law presumed unconstitutional. See *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (opinion by Scalia, J.) (content-based regulations on speech are presumptively invalid). As the party with the burden of proof at trial, the Defendants must establish "beyond controversy" that their policies satisfy each element of the applicable test for heightened scrutiny and thus passes constitutional muster. *See*, *S. California Gas Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003*)*

"A law will be struck down under intermediate scrutiny unless it can be shown that it is substantially related to achievement of an important governmental purpose." *Stop H-3 Ass'n v. Dole*, 870 F.2d 1419, 1430 n. 7 (9th Cir. 1989). In defending content-neutral regulations under the First Amendment, the Supreme Court has noted that the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994)

27

(plurality opinion). To meet the standards of intermediate scrutiny, the Defendants must show evidence that depriving citizens of the right to be "armed and ready" for self-defense because they cannot document a specific threat against them which cannot be avoided, furthers an important state interest. Defendants can make no such showing.

Plaintiffs are both highly trained in the use of firearms and have a legitimate justifiable need to carry a handgun for self-defense. Thus, they are the law abiding citizens the New Jersey legislature contemplated when it drafted the justifiable need statute. There is no governmental interest in denying Plaintiffs their permits to carry a firearm because of the danger posed to their lives. This Court should be reminded that this preliminary injunction is based on an as-applied challenge and will only affect the two individual Plaintiffs. The government has not and cannot demonstrate why there is an important government interest in denying Plaintiffs the right to carry either openly or concealed.

For the foregoing reasons, Plaintiffs are likely to succeed on the merits on their claim. And as demonstrated below, they satisfy the remaining prongs of the preliminary injunction test.

## II.    Plaintiffs Will Continue to Suffer Irreparable Harm in the Absence of Preliminary Relief

The second question in the preliminary injunction analysis is whether the applicant is likely to suffer irreparable harm unless an injunction issues. *See Winter*

*v. NRDC*, 555 U.S. 7, 22 (2008). The irreparable harm inquiry requires the Court to assume that Plaintiffs have demonstrated a likelihood of success on the merits and then to ask "whether that violation, if true, inflicts irremediable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006).

An allegation that the Defendants' actions violate the Plaintiffs' constitutional rights typically satisfies the requirement of "irreparable injury." As the D.C. Circuit has explained, "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (brackets omitted) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Id*. (brackets omitted) (quoting *Davis*, 158 F.3d at 1346).

The principle that the violation of a constitutional right, without more, typically amounts to irreparable harm derives from the statement of a plurality of the Supreme Court in *Elrod v. Burns* that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976). As the Seventh Circuit has explained:

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing

from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future. *Ezell v. City of Chicago,* 651 F.3d 684, 699 (7th Cir. 2011) (internal quotation marks omitted).

And the Second Amendment also protects "intangible and unquantifiable interests." *Id.* Indeed, its "central component is the right to possess firearms for protection," and violations of that right plainly "cannot be compensated by damages." *Id.* Thus, for violations of Second Amendment rights, as for violations of First Amendment rights, "irreparable harm is presumed." *Id.*

For these reasons, law-abiding citizens like Plaintiffs suffer irreparable harm each day that they suffer an ongoing deprivation of their constitutional right to carry a firearm, either openly or concealed, in public for self-defense. The allegation of the violation, without more, satisfies the irreparable injury requirement. Even if Plaintiffs were required to establish a likelihood that New Jersey's carry ban will "chill" their exercise of constitutionally protected conduct, *see Chaplaincy of Full Gospel,* 454 F.3d at 299, they have satisfied this requirement by declaring that, but for New Jersey's laws, they would carry a firearm in public, either openly or concealed, for self-defense.  Plaintiffs risk physical injury and maybe death because they are unable to exercise their Second Amendment right to self-defense. Of course, that injury cannot be compensated through money damages. *See Ezell*, 651 F.3d at 699. Each day these laws remain in effect, Plaintiffs face the choice of limiting their

travel to places where there is a minimal risk of bodily injury — or traveling freely throughout the State, working their chosen profession, without the ability to protect themselves against violent crime in light of the threats against them. If Plaintiffs prevail, the only appropriate remedy (and the only remedy Plaintiffs seek) is declaratory and injunctive in nature.

### III.   The Balance of Equities Tips in Plaintiffs' Favor

The equities weigh strongly in Plaintiffs' favor. Plaintiffs continue to suffer an ongoing violation of their constitutional rights, and this ongoing violation constitutes irreparable injury. On the other side of the ledger, any interests invoked by New Jersey are entirely speculative. Plaintiffs only seek an injunction to allow Plaintiffs the right to carry arms in public, either openly or concealed, for purposes of self-defense.

Plaintiffs do not seek an unfettered right to bear arms free from any regulation or oversight by the New Jersey as-applied to them. Plaintiffs challenge only the Defendants limitations on carrying handguns, "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629, and the injunction that Plaintiffs request would leave in place myriad laws regulating the right to carry handguns in public, either openly or concealed, including the prohibitions on carrying without a license. In short, enjoining the operation of the challenged provisions would result in two licensed, vetted, and trained persons having a general but not unrestricted right to

carry handguns outside the home either openly or concealed. There is nothing to demonstrate that allowing the two plaintiffs in this action to carry would be anything other than in the public interest.

## IV.    An Injunction Is in the Public Interest

For similar reasons, an injunction is also in the public interest. The Third Circuit has acknowledged the fact that enforcement of an unconstitutional law is always contrary to the public interest. *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest."). Because enforcement of this unconstitutional law is by definition contrary to the public interest, the entry of a preliminary injunction serves the public interest as a matter of law. Moreover, the analysis with respect to the balancing of the equities indicates that the public interest is served by vindicating citizens' constitutional rights and affording them an opportunity to defend themselves in public, not by perpetuating an unconstitutional and ineffective restriction on that right.

## V.    The Court Should Enter Final Judgment for Plaintiffs

The Federal Rules of Civil Procedure permit this Court to "advance the trial on the merits and consolidate it with the hearing" for a preliminary injunction. FED. R. CIV. P. 65(a)(2). "[W]hen the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge

the stages and enter a final judgment." *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994)).

A permanent injunction is appropriate now. The final outcome of this case will not depend on any facts presented at trial, and there is no "genuine uncertainty at the preliminary injunction stage concerning what that outcome will be." *See Curtis 1000*, 24 F.3d at 945. At this stage, the Court has all the facts that it needs—only questions of law remain. As in *Moore v. Madigan,* 702 F.3d 933, 942 (7th Cir. 2012), "[t]he constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial." To the extent there are any questions of disputed fact, those questions involve only "legislative facts" that bear on the justification for legislation, not "adjudicative facts" that must be determined at trial. *Id*. The Seventh Circuit's disposition in *Moore* is particularly instructive here, as that court remanded for entry of a declaration of unconstitutionality and a permanent injunction upon reversing the district court's judgment granting the State of Illinois's motion to dismiss:

> The usual consequence of reversing the dismissal of a suit (here a pair of suits) is to remand the case for evidentiary proceedings preparatory to the filing of motions for summary judgment and if those motions fail to an eventual trial. But there are no evidentiary issues in these two cases. The constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial . . . . Only adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of the Illinois gun law. The key

legislative facts in this case are the effects of the Illinois law; the state has failed to show that those effects are positive.

We are disinclined to engage in another round of historical analysis to determine whether eighteenth-century America understood the Second Amendment to include a right to bear guns outside the home. The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside. The theoretical and empirical evidence (which overall is inconclusive) is consistent with concluding that a right to carry firearms in public may promote self-defense. Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety. It has failed to meet this burden. The Supreme Court's interpretation of the Second Amendment therefore compels us to reverse the decisions in the two cases before us and remand them to their respective district courts for the entry of declarations of unconstitutionality and permanent injunctions.

*Moore*, 702 F.3d at 942 (citations omitted). Likewise, in this case, the Court will have all the information it needs to make a final judgment upon conclusion of the preliminary injunction proceedings. The Court should enter final judgment and put a final end to the New Jersey's laws prohibiting typical, law-abiding, responsible citizens from exercising their fundamental, individual right to carry, either openly or concealed, a firearm outside the home for self-defense.

Conclusion

For the foregoing reasons, Plaintiffs Albert Almeida and Michael Tumminelli respectfully request that this Court issue a preliminary injunction for the duration of litigation and for any other relief this Court deems necessary and proper.

This, the 1<u>st</u>  day of July, 2016.

Respectfully submitted,

*/s/ Ryan S. Watson*
RYAN S. WATSON

**Of Counsel:**

Ryan S. Watson
Law Offices of J. Scott Watson, P.C.
24 Regency Plaza
Glen Mills, PA  19342
(610) 358-9600
NJ Bar No. 089642013
ryan.watson@jscottwatson.com

Stephen D. Stamboulieh                          Alan Alexander Beck
Stamboulieh Law, PLLC                           Law Office of Alan Beck
P.O. Box 4008                                    4780 Governor Drive
Madison, MS  39130                               San Diego, CA  92122
(601) 852-3440                                   (619) 905-9105
stephen@sdslaw.us                                Alan.alexander.beck@gmail.com
MS Bar No. 102784                                *Pending Admission Pro Hac Vice
*Admitted Pro Hac Vice

35

## CERTIFICATE OF SERVICE

I hereby certify that on July 1st, 2016, I electronically filed the foregoing document or pleading using the CM/ECF system which generated a NEF for all counsel of record.

I hereby certify that the following non-CM/ECF participants were served a copy of the foregoing document or pleading by United States Postal Service, postage prepaid:

Honorable Carmen Alvarez
Superior Court, Appellate Division
P.O. Box 280
Cape May Court House, NJ 08210-0280

Shaina Brenner
Sussex County Prosecutor's Office
1921 High Street
Newton, NJ 07860

The Honorable Peter Conforti
Superior Court, Criminal Division, Morris County
Sussex County Courthouse
4437 High Street, 3rd Floor
Newton, NJ 07860

Robert Lougy
Acting Attorney General
25 Market Street
Trenton, NJ 08611

Chief Michael Richards
Newton Police Department
39 Trinity Street
Newton, NJ 07860

Honorable Marie Simonelli
Superior Court, Appellate Division
Leroy F. Smith, Jr. Public Safety Complex
60 Nelson Place, 8th Floor
Newark, NJ 07102-1501

Sussex County
Office of the County Administrator
One Spring Street
Newton, NJ 07860

By: */s/ Ryan S. Watson*
        Ryan S. Watson